IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BILL CARROLL<br>2429 Locust Street, Unit 608<br>Philadelphia, PA 19103<br>　　　　　　　　　　Plaintiff,<br><br><br>　　　　　v.<br><br>GUARDANT HEALTH, INC.<br>505 Penobscot Drive<br>Redwood City, CA 94063<br>　　　　　　　　　　Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:　　Civil Action No.<br>:<br>:<br>:<br>:<br>:　　**JURY TRIAL DEMANDED**<br>: |

## COMPLAINT

Plaintiff, Bill Carroll ("Mr. Carroll" or "Plaintiff"), by and through his undersigned attorneys, Griesing Law, LLC, hereby files this Complaint and initiates this action to seek redress against Guardant Health, Inc. ("Guardant" or "Defendant"), his former employer, for breach of contract, unlawful age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), unlawful gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), violation of the Pennsylvania Human Relations Act, 43 P.S. § 951, et. seq., defamation, tortious interference, fraudulent inducement and other applicable federal and state laws.

## INTRODUCTION

Bill Carroll is a 57-year-old professional who has been supervising sales representatives selling products to doctors and hospitals for decades, all the while working for and with women and never having a single complaint raised about how he treated or referred to women. He worked hard to become one of the highest performing biotechnology sales professionals in the country.  He was

also a loving father raising two daughters.  However, in just a few months at Guardant Health, Inc., individuals who were not happy that Mr. Carroll was pushing them to work harder and upsetting the status quo – which is what he was hired to do – fabricated statements that they claimed he made that were derogatory of women.  Guardant accepted these employees' false accusations, conducted a sham investigation and terminated Mr. Carroll, reducing his professional life to rubble.

After spending over eight years with a large biotech firm, Veracyte, Inc., Mr. Carroll had achieved professional success – he had a secure job, great compensation, and a great team of women and men with whom he loved working.  Then, in the spring of 2019, a smaller biotech firm, Guardant, approached Mr. Carroll about a potential career shift.  Mr. Carroll's initial response was to decline Guardant's overtures, but Guardant was persistent.  Guardant engaged in what can only be described as a "wooing" of Mr. Carroll for several months.  While Guardant could not offer the same level of monetary compensation as Veracyte—not by a long shot—they were able to offer opportunity.  The opportunity that, in the long view, Mr. Carroll would be able to build up Guardant and reap the financial and professional success that would flow from his hard work.  And to do this, Mr. Carroll would be given extreme flexibility in hiring and managing his sales team.  From Guardant's perspective, Mr. Carroll presented opportunity as well.  The opportunity to shake things up in an underperforming sales region with a fresh pair of eyes with a fresh perspective.  After protracted wooing and negotiating the terms of his employment, Mr. Carroll agreed to join Guardant in the summer of 2019.

Immediately, Mr. Carroll proved he intended to keep up his end of the bargain.  He identified the strong and weak performers on his inherited team, gave praise and constructive criticism where appropriate, and instructed his underperforming team members how they could grow their sales for the company.  Obviously, this disruption of Guardant's stale status quo did not go over well with

everyone.  As this Complaint demonstrates, certain Guardant employees fabricated statements that Mr. Carroll allegedly said, which were absolutely false, and defamed him, accusing him of referring to female colleagues in an unprofessional manner.  But, given everything Mr. Carroll gave up to join Guardant, and the fact that these accusations were coming from disgruntled employees, it could only be expected that Guardant would properly investigate these false accusations before taking action against Mr. Carroll.  This did not happen.  Instead, Guardant opted to terminate Mr. Carroll without even considering his version of events—the truth.

## PARTIES

1.      Plaintiff is a male individual, who resides at 2429 Locust Street, Unit 608, Philadelphia, PA 19103.  He was formerly employed by Defendant from on or about July 15, 2019 through September 3, 2019, when he was abruptly and wrongfully terminated.

2.      Upon information and belief, Guardant is a Delaware corporation with its principle place of business at 505 Penobscot Drive, Redwood City, California, 94063.

3.      Guardant is a business entity that does significant business within the Commonwealth of Pennsylvania, is engaged in an industry affecting commerce in Pennsylvania and is Mr. Carroll's former employer.

4.      At all relevant times, Defendant, who employs more than 20 employees, is and has been an "employer" as defined under the laws at issue in this suit and is accordingly subject to the provisions therein.

5.      At all relevant times, Plaintiff was an "employee" of Defendant within the meaning of the laws at issue in this suit and is accordingly entitled to the protections of same.

6.      Mr. Carroll worked for Guardant from his home in Philadelphia, PA.

7.      At all relevant times, employees of Guardant acted as agents and servants of

3

Guardant, within the scope of their authority and in the course of employment under the direct control of Guardant.

8.      At all times material hereto, Guardant acted by and through its authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Guardant and in furtherance of Guardant's business.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

10.      This Court has original jurisdiction over the instant action pursuant to 28 U.S. C. §§ 1331 and 1343 (a)(4) because it arises under the laws of the United States and seeks redress for violations of civil rights.

11.      This Court has supplemental jurisdiction over any Pennsylvania state law claims pursuant to 28 U.S.C. § 1367.

12.      In the alternative, this Court has diversity jurisdiction over the instant action pursuant to 28 U.S. C. §§ 1332.

13.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in the Eastern District of Pennsylvania.

14.      This Court has personal jurisdiction over Defendant.

## MR. CARROLL HAS REQUESTED A RIGHT TO SUE LETTER FROM THE EEOC

15.      On February 7, 2020, Mr. Carroll filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), and he requested that the EEOC submit the filing to the Pennsylvania Human Relations Commission.

16.     On March 17, 2020, Guardant filed its position statement in the aforementioned EEOC matter; on April 6, 2020, Mr. Carroll filed his response to Guardant's position statement.

17.     On April 8, 2020, the EEOC issued a Dismissal and Notice of Rights, but because of COVID-19 and the related closure of the EEOC office, the EEOC did not issue the Notice of Right to Sue letter; to date, Mr. Carroll has not received the Notice of Right to Sue letter.

18.     On June 29, 2020, counsel for Mr. Carroll sent a letter to the EEOC requesting the EEOC issue him a Notice of Right to Sue letter.

19.     Thus, Mr. Carroll is now permitted to bring his claims that were the subject of his EEOC action in this Court.

## **FACTS**

20.     All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

21.     Mr. Carroll is a 57 year-old man and within the class of individuals protected by the ADEA from discrimination, harassment and retaliation in employment.

22.     Mr. Carroll is a highly skilled and accomplished sales professional and at the time he commenced employment with Guardant he already had over 25 years of experience in sales and sales management, with emphasis on the biotechnology field in which he was highly successful and respected.

23.     Prior to joining Guardant, Mr. Carroll had worked at Veracyte, Inc. ("Veracyte") for over eight years, where he held the position of Senior Regional Sales Director, Northeast-Midwest, and previously held the position of Endocrine Product Specialist, Mid-Atlantic Region.  Prior to working at Veracyte, Mr. Carroll held top Sales Management positions at several other companies in the biotechnology field and was highly recruited for increasingly high profile positions within

the industry.  A graduate of Rutgers University with a degree in Business Administration, Mr. Carroll was a stellar employee with a proven record of accomplishment in his field.

24.     His record for over 25 years working with teams and increasingly as a leader of diverse teams was impeccable.  He had a reputation for being fair and inspirational to his colleagues and stakeholders, regardless of gender, race, nationality, disability or other characteristics.

25.     Throughout his career prior to working at Guardant, Mr. Carroll had an unblemished and positive record of collaborating professionally with a diverse community of people, including women, and he has been routinely hired by and reported to women throughout the duration of his career and worked with women as peers and as a supervisor.

26.     It is because of his proven record leading and improving his teams and leading a diverse group of sales professionals that Guardant approached Mr. Carroll to join their team and leave his secure and highly compensated position at Veracyte.

27.     Guardant began courting Mr. Carroll for a Vice President of Sales position as early as 2015.  Although Guardant did not select Mr. Carroll for that role, Mr. Carroll met members of the Guardant team during that process.

28.     Clearly impressed by Mr. Carroll, Steven Collora, who later became Guardant's Vice President of Sales, and Dr. Richard Lanman, Chief Medical Officer, approached Mr. Carroll in May 2019 about joining Guardant.

29.     Dr. Lanman and Mr. Collora were persistent in urging Mr. Carroll to come on board because the company was expanding rapidly and there were many excellent opportunities for Mr. Carroll.   Mr. Collora offered Mr. Carroll three separate positions to consider and assured Mr. Carroll that Mr. Collora would secure one of the three potential positions for Mr. Carroll.

30.     As part of this recruitment process and efforts to lure Mr. Carroll to leave his secure

position, Guardant arranged for Mr. Carroll to travel from Philadelphia to Dallas and then to Florida. In Dallas, he met with Mr. Collora and spoke by telephone with Ms. Danielle Usilton, the top Regional Sales Manager who Guardant had promoted to National Sales Director for the Company. Mr. Collora made clear that, because Mr. Carroll would be reporting to Ms. Usilton if he joined the team, Ms. Usilton had final say on whether the Company hired him.

31.     In Florida, Mr. Carroll met with Ms. Usilton and understood that if Mr. Carroll accepted the offer, he was to report to Ms. Usilton, with whom he felt a rapport during the hiring process. Mr. Carroll was enthusiastic about the opportunity to join Ms. Usilton's team and to work collaboratively with her given her achievements. He did not have any reservations or concerns about working with or reporting to a female colleague. Indeed, for over 25 years before joining Guardant, Mr. Carroll had previously worked with and reported to female supervisors with no issues and great success.

32.     During Mr. Carroll's discussions with the Guardant leadership about joining the company as a Regional Sales Director for the Atlantic Region, the leadership, including Mr. Collora, Dr. Lanman and Ms. Usilton, stated that they wanted Mr. Carroll to lead and turn around a team that had members that were under-performing. They gave Mr. Carroll detailed assessments of each member of the team he would be leading if he joined the company and the deficiencies they would expect Mr. Carroll to address. The team identified to Mr. Carroll as his expected direct reports included four women and one man. Again, Mr. Carroll, an experienced sales manager and the father who had raised two daughters, had no reservations or concerns about leading a team of principally female colleagues.

33.     The Guardant team actively recruiting Mr. Carroll also stated that once he was on-board, they wanted him to hire additional members to fill various positions on his new team.

7

34.     During the recruitment process, Mr. Carroll told Guardant representatives Mr. Collora, Ms. Usilton, Dr. Lanman and Ms. Lisa Condon, Talent Acquisition, Principal Staffing Partner, that he had a significant amount to lose professionally and financially if he left Veracyte. He also told them that he was unwilling to resign from Veracyte or join Guardant until the Guardant representatives were 100% certain that Mr. Carroll had the position they offered, with no contingencies, and that the parties had reached agreement on the terms of his employment.  Mr. Carroll told the Guardant leadership that this offer to join Guardant must be a secure move for him or he would not leave Veracyte to join Guardant.

35.     As of May 2019, Mr. Carroll was in a favorable financial position at Veracyte.  He was on track to earn $250,000, plus receiving several other benefits including health, dental, car allowance, restricted stock units and retirement contributions.  Notably, Mr. Carroll also held stock options in Veracyte worth roughly $350,000-$400,000, which were due to vest in the following six months to three years, provided Mr. Carroll remained at Veracyte.  In addition, during his tenure at Veracyte, Mr. Carroll had received numerous awards for his accomplishments in sales and sales team leadership.

36.     Mr. Carroll made clear to Guardant that he did not want to leave his secure position where he had received accolades and promotions, or forfeit any of these valuable forms of compensation, by the risk of joining Guardant without solid commitment from Guardant as to his job security.

37.     Mr. Carroll was lured away from his prior employer where he left significant, multiple forms of compensation, including but not limited to valuable stock options, on the table in exchange for the promise of an increase in his then-current salary, company perquisites including substantial Restricted Stock Units, and a promising career with Guardant.

8

38.     Mr. Carroll received an offer letter from Guardant on May 31, 2019.  Only after he received the requisite assurances from Guardant as to the permanence and security of the offered position.

39.     Mr. Carroll began work at Guardant on July 15, 2019.  He started with at-home training and began to recruit to hire someone to fill an open position on his team.

40.     One of his first decisions in his new role at Guardant was to consider a new hire, Ms. Meredith Montgomery, the only female of the four candidates he interviewed for the position, who had been in the pipeline for consideration subject to Mr. Carroll's approving her hire.  Mr. Carroll was delighted to have Ms. Montgomery join his team after interviewing her by telephone and in person and being impressed by her track record, impressive contacts in the industry and top references.  Although Mr. Carroll inherited a predominately-female team, his first hire to expand the team was a woman.  He based his decision on her credentials and experience and not on anything else, as he wanted the best person for the job to bolster the team that his new boss had described as "under-performing."

41.     This was an exciting time for Mr. Carroll that he shared with many of his colleagues.  He happily shared with them that as a father of two daughters, he was excited to, for the first time, lead a team "that is predominantly women."

42.     For the next several weeks, Mr. Carroll continued to perform his job at the best of his ability and work to develop rapport with his team and stakeholders.

43.     On August 29, 2019, Mr. Carroll received a telephone call from Mr. Collora, who had recruited him to Guardant, asking whether Mr. Carroll had said to anybody that he was working on a team "with a bunch of chicks."  Mr. Carroll informed Mr. Collora that he did not say that and that he does not use the term "chicks" to refer to women.  Mr. Collora immediately responded that

he knew it was not in Mr. Carroll's character to speak like that.  Mr. Collora also stated that the complaint that Mr. Carroll had allegedly referred to women as "chicks" was likely precipitated because Mr. Carroll was "changing and disrupting the status quo" and giving the team more "direction" and "holding them accountable" as was the mandate for Mr. Carroll when he was hired. Mr. Collora also stated in that telephone conversation that "there may be some resistance" to Mr. Carroll's efforts to carry out this mandate, resulting in unfounded complaints about Mr. Carroll. Mr. Collora proceeded to compliment the work Mr. Carroll had accomplished thus far in providing direction to his new team.

44.     On September 3, 2019, Mr. Carroll received a telephone call from "Danielle" (his supervisor, Ms. Usilton) and "Lynn" (who identified herself as someone from Guardant HR). "Lynn" read a prepared statement informing Mr. Carroll that the Company was dismissing him immediately for saying derogatory comments about women.   When Mr. Carroll asked for clarification as to what this pertained to, she responded that someone informed the Company that Mr. Carroll said he works on a team "full of fucking chicks" and that others had corroborated the story.

45.     Mr. Carroll asked Lynn to provide her full name and she repeatedly refused to do so.  Lynn refused to discuss the decision with Mr. Carroll, as "the decision was final" and said "this is not a discussion."  Lynn was uninterested in hearing anything from Mr. Carroll about his side of the story. Lynn made clear that the Company was not going to give Mr. Carroll an opportunity to defend himself from these false and defamatory allegations.

46.     Never once, prior to his termination or during the termination call, did anyone at Guardant, either from Human Resources or some other supervisory position, share with Mr. Carroll the specifics of the statements allegedly attributed to him, ask Mr. Carroll for his account of the

alleged statement, or provide him with any opportunity to dispute those salacious and false allegations.  In fact, other than the call from Mr. Collora, who presented Mr. Carroll with a different version of the alleged statements, which Mr. Carroll denied and continues to deny, no one at Guardant asked Mr. Carroll a single question to confirm or deny this fabricated story.

47.     Furthermore, following Mr. Carroll's abrupt termination, several colleagues, both male and female, spoke with Mr. Carroll, stating that they knew from personal experience working with Mr. Carroll that he <u>did not</u> and would not speak about women in that manner.

48.     Relatedly, two days following Mr. Carroll's termination, Danielle Usilton texted Mr. Carroll to demonstrate her remorse for how Guardant handled the situation, saying "I am really sorry that this happened."

49.     The allegations which led to the termination of Mr. Carroll's employment at Guardant are false.

50.     Certain employees who reported to and/or worked with Mr. Carroll and were underperforming at Guardant were not happy with Mr. Carroll's effort to improve and turn around the underperforming team; and that these employees resisted Mr. Carroll's attempts to improve the team and to change the status quo.

51.     For example, Joe Bianco, who was slated to be a member of Mr. Carroll's sales team, was underperforming so badly that Guardant wanted to terminate him and flagged him as a candidate for a Performance Improvement Plan or "PIP."

52.     In addition, there were other employees at Guardant who were displeased with various reorganizational changes and with the Company's recruitment of Mr. Carroll to turnaround a flagging sales group.

53.     These employees and their supporters had a motive to falsely accuse Mr. Carroll of

making sexist comments in the workplace.  The alleged comments attributed to Mr. Carroll are false and the allegations are defamatory.

54.     Guardant never gave Mr. Carroll a chance to respond to the salacious allegations asserted against him; he had a right to – but was denied – a full and fair investigation and an opportunity to confront his accusers and clear his name.

55.     Mr. Carroll faced discrimination based on his gender and age by Guardant blindly accepting the false allegations made against a 57-year-old man and concerning statements he made about women as true without conducting a fair and thorough investigation to obtain Mr. Carroll's side of the story before making a decision as to his future with the Company.  During much of Mr. Carroll's early career, women were improperly and unfairly overlooked in the workplace.  So, to Mr. Carroll, it was thrilling to finally be working with a team with so many capable women.  For the entirety of his lengthy career, Mr. Carroll has never referred to any of his colleagues in any derogatory manner, including referring to them as "chicks" or "gals."

56.     As a consequence of Guardant's wrongful and discriminatory treatment of Mr. Carroll, Mr. Carroll has suffered substantial financial loss and other harm, including but not limited to loss of future income, compensatory damages, reputational harm/defamation, and pain and suffering.

57.     Guardant subjected Mr. Carroll to discrimination on the basis of his gender and age by failing to conduct a full and fair investigation and not giving him an opportunity to confront his accusers or respond to these salacious allegations.  It is discriminatory to baldly accept the allegations of accusers of one gender while failing to give the accused of another gender equal opportunity to present their position in defense of those allegations. Upon information and belief, if Mr. Carroll had alleged that a female superior had harassed him or that a female subordinate had

offered sexual favors in exchange for more favorable work conditions, a raise or a promotion, the Company would not have merely accepted his accusations blindly without properly investigating such allegations and affording the accused a fair and thorough opportunity to respond.

58.     Mr. Carroll raised with Guardant that their decision was discriminatory, that he was entitled to but denied a full and fair investigation, and that he was not permitted to know or respond fully to the baseless allegations of his accusers.  Guardant failed to address Mr. Carroll's concerns, and upon information and belief, spread false information about Mr. Carroll inside and outside the Company.

59.     Also, it has been reported to Mr. Carroll that representatives of Guardant have shared these salacious, defamatory and false allegations with others and, in doing so, Guardant also continues to defame and cause harm to Mr. Carroll's professional standing, reputation and ability to find alternate employment.

60.     Accordingly, Defendant Guardant discriminated against and harassed Mr. Carroll because of his age and gender, and retaliated against Mr. Carroll because of his complaints about this discrimination. Specifically, Guardant repeatedly threatened Mr. Carroll with liability and attorneys' fees if he attempted to pursue his claims and clear his good name.

61.     In addition, Guardant employees and representatives have blackballed Mr. Carroll in the industry by spreading false and defamatory allegations preventing him from obtaining other employment.

62.     Guardant willfully violated the ADEA, Title VII, and the PHRA because Guardant knew that its actions violated these statutes, and/or acted with reckless disregard as to whether its actions violated them.

63.     Upon information and belief, Guardant's facially neutral practices, policies, and/or

customs had a disparate impact upon male employees and employees over the age of 40.

64.     Mr. Carroll has suffered financial losses and economic harm as a direct and proximate result of the actions and inactions of Defendant Guardant.

65.     Mr. Carroll has suffered lost wages and other benefits of employment because of Defendant's wrongful acts, as alleged herein.

66.     Mr. Carroll has suffered severe emotional and psychological distress and other emotional loss because of Defendant's wrongful acts, as alleged herein.

67.     Guardant's discriminatory and retaliatory actions are also a breach of the express and implied terms of his employment, on which he relied in foregoing his former secure position at Veracyte, causing him personal, physical and financial harm.

68.     Guardant's discriminatory and retaliatory actions are also a breach of the Company's own policies and procedures, which require that the Company conduct a full and fair investigation of complaints made against employees, refrain from discrimination on the basis of gender, age or other improper criteria and further refrain from retaliation or other actions in response to complaints of discrimination.

## COUNT I
## Breach of Contract

69.     Plaintiff Mr. Carroll repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

70.     The oral and written agreements between Mr. Carroll and Guardant pertaining to the terms of his employment are binding and enforceable.

71.     Mr. Carroll fulfilled all of his obligations under the contract between the parties.

72.     As detailed above, Guardant breached the contract in numerous, material ways including but not limited to:

14

a.  failing to act in good faith;

b.  making an unwarranted and inaccurate finding that Mr. Carroll made sexist comments in the workplace;

c.  refusing to give Mr. Carroll a chance to respond to the false allegations asserted against him;

d.  denying Mr. Carroll a full and fair investigation and an opportunity to confront his accusers and clear his name;

e.  improperly punishing Mr. Carroll for implementing his appropriate and proven management techniques on his struggling sales team.

f.  spreading salacious, defamatory, and false allegations among the employees and representatives of Guardant and within the medical community as a whole, both before and after his improper termination, causing harm to Mr. Carroll's professional standing, reputation and ability to find alternate employment;

g.  improperly terminating Mr. Carroll as an employee of Guardant;

h.  retaliating against Mr. Carroll by threatening to seek legal fees from him if he pursues efforts to clear his name and reputation; and

i.  taking all the aforementioned actions against Mr. Carroll despite the fact that Guardant knew that the allegations against Mr. Carroll were not true and that he never made sexist comments in the workplace.

73.  Guardant also breached the express and implied terms of Mr. Carroll's employment.

74.  For example, under Pennsylvania law, it is well settled that every contract contains an implied duty of good faith; Guardant breached this implied duty of good faith by not providing

Mr. Carroll a full and fair investigation, disciplining and eventually terminating him.

75.     Here, the presence of additional consideration defeats the presumption of at-will employment.

76.     As the foregoing paragraphs demonstrate, Mr. Carroll underwent a substantial hardship (other than the services he agreed to perform) when agreed to the terms of employment. Mr. Carroll sacrificed hundreds of thousands of dollars per year in compensation and benefits from Veracyte, in addition to roughly $350,000 to $400,000 in stock options that were to vest in the upcoming months

77.     Guardant breached the terms of employment by prematurely and improperly terminating Mr. Carroll.

78.     Mr. Carroll has suffered substantial financial harm, as well as compensatory damages and pain and suffering, as a direct and proximate result of the breach including, without limitation, actual damages with interest due thereupon, punitive damages, and attorneys' fees and costs.

## <u>COUNT II</u>
**For Age Discrimination in Violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.***

79.     Plaintiff Mr. Carroll repeats and incorporates by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

80.     Mr. Carroll is over forty years of age and is an individual within the class protected by the Age Discrimination in Employment Act.

81.     In discriminating against and harassing Mr. Carroll because of his age, and retaliating against Plaintiff for asserting his rights, Guardant violated the Age Discrimination in Employment Act.

16

82.     Defendant Guardant intentionally and willfully discriminated against and harassed Plaintiff Mr. Carroll because of his age and retaliated against Mr. Carroll because of his complaints about discrimination and harassment by threatening him with financial damages and attorneys' fees liability if he pursued his claims.

83.     Upon information and belief, Guardant's facially neutral practices, policies, and/or customs had a disparate impact upon employees over the age of forty at Guardant in violation of the ADEA.

84.     As a direct result of Defendant's unlawful employment practices, Plaintiff has suffered a loss of earnings, loss of future earning power, severe emotional and physiological distress as well as back pay, front pay, and interest due thereon.

85.     Defendant Guardant's willful violations of the ADEA warrant an award of actual and punitive damages, attorneys' fees and costs, and interest.

86.     Guardant's conduct was outrageous, malicious, wanton, willful, and showed reckless indifference to the interests of Mr. Carroll.

### <u>COUNT III</u>
**For Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.***

87.     Plaintiff Mr. Carroll repeats and incorporates by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

88.     Mr. Carroll is a male individual within the class protected by Title VII of the Civil Rights Act of 1964.

89.     Guardant engaged in unlawful employment practices, in violation of Title VII by discriminating against Mr. Carroll on the basis of sex.

90.     The effect of Guardant's unlawful employment practices was to deprive Mr. Carroll

17

of equal employment opportunities and otherwise adversely affect his status as an employee because of his sex.

91.     Defendant Guardant intentionally and willfully discriminated against and harassed Mr. Carroll because of his sex and retaliated against Mr. Carroll because of his complaints about discrimination and harassment as to the Company's failure to conduct a full and fair investigation of false and defamatory claims made against him concern statements he allegedly made about women.

92.     Upon information and belief, Defendant Guardant's facially neutral practices, policies, and/or customs had a disparate impact upon male employees at Guardant in violation of Title VII of the Civil Rights Act of 1964. For example, upon information and belief, Guardant did not follow its own practices, policies and/or customs in handling the complaints lodged against Mr. Carroll and did not investigate the complaints in the same manner as it handles complaints by and against female employees.

93.     As a direct result of Defendant's unlawful employment practices, Plaintiff has suffered a loss of earnings, severe emotion and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon.

94.     Defendant Guardant's willful violations of Title VII of the Civil Rights Act of 1964 warrant an award of actual and punitive damages, attorneys' fees and costs, and interest.

95.     Guardant's conduct was outrageous, malicious, wanton, willful, and showed reckless indifference to the interests of Mr. Carroll.

## COUNT IV
### For Violations of the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.*

96.     Plaintiff Mr. Carroll repeats and incorporates by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

97.     Based on the foregoing, Defendant Guardant engaged in unlawful employment practices in violation of the Pennsylvania Human Relations Act.

98.     In discriminating and harassing Mr. Carroll because of his age and gender and in retaliating against Mr. Carroll for his complaints that Guardant failed to fully and fairly investigate the false and defamatory allegations amounted to discrimination, harassment, and retaliation, Defendant Guardant violated the Pennsylvania Human Relations Act.

99.     Defendant intentionally discriminated against, harassed and retaliated against Mr. Carroll.

100.     Defendant's intentional violations of the PHRA warrant an award of damages to compensate Mr. Carroll for his emotional distress suffered as a result of Defendant's violations of the PHRA.

101.     As the direct result of the aforesaid unlawful employment practices engaged in by Defendant, Plaintiff Mr. Carroll has sustained a loss of earnings, severe emotion and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon and has incurred attorneys' fees and costs.

102.     Guardant's conduct was outrageous, malicious, wanton, willful, and showed reckless indifference to the interests of Mr. Carroll.

### COUNT V
### Defamation

103.     Plaintiff Mr. Carroll repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

104.     Defendant Guardant, acting through its employees, agents, and representatives, published to numerous third-parties, both inside Guardant and outside the company, salacious and false comments alleged to have been made by Mr. Carroll.

105.    As a result of these false allegations, Mr. Carroll lost his position at Guardant and has been unable to find new employment as a result of Guardant repeating these false and defamatory allegations outside the company in the greater biotechnology community.

106.    Defendant Guardant, through its agents, employees, and representatives, falsely and maliciously repeated untrue allegations that Mr. Carroll made sexist comments in the workplace, when in fact he had not.  For example, several Veracyte employees contacted Mr. Carroll following his termination from Guardant expressing their condolences and disbelief that Mr. Carroll would make inappropriate comments.

107.    The actions of Guardant have damaged the reputation of Mr. Carroll and caused him substantial financial and non-financial injury and damaged his personal and professional standing within the community.

108.    Guardant's conduct was outrageous, malicious, wanton, willful, and showed reckless indifference to the interests of Mr. Carroll.

## COUNT VI
### Tortious interference

109.    Plaintiff Mr. Carroll repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

110.    As mentioned above, Guardant and Mr. Carroll entered into a valid, binding, and enforceable contract in the spring of 2019.

111.    Upon information and belief, several employees of Guardant were aware of the contract between Guardant and Mr. Carroll.

112.    Upon information and belief, these employees intentionally and improperly lied to Guardant management claiming Mr. Carroll made inappropriate statements referring to female colleagues.

20

113.   These fabrications directly lead to the August 29, 2019 phone call, and ultimately, Mr. Carroll's termination.

114.   To reiterate, Mr. Carroll never referred to anyone as a "chick" or a "gal," nor does Mr. Carroll use those terms in his regular manner of speaking.  Use of this language is so plainly and obviously outside of Mr. Carroll's character that even Mr. Steven Collora, who had only known Mr. Carroll for a matter of months, recognized the incongruity.

115.   As a direct and proximate cause of the actions of the employees, Mr. Carroll suffered a loss of earnings due under the contract with Guardant.

116.   Guardant's conduct was outrageous, malicious, wanton, willful, and showed reckless indifference to the interests of Mr. Carroll.

**COUNT VII**
**Fraudulent Inducement**

117.   Plaintiff Mr. Carroll repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

118.   In the Spring of 2019, following substantial and protracted negotiations, Guardant induced Mr. Carroll to enter into an employment contract.

119.   During the negotiating process, Guardant made numerous misrepresentations to Mr. Carroll regarding, *inter alia*, Guardant's plans for expansion, desire to have Mr. Carroll implement his proven management techniques to vitalize an underperforming sales region, and Guardant's general interest in having Mr. Carroll as a long-term member of the company.

120.   These misrepresentations were verbalized to Mr. Carroll during several meetings with Guardant representatives, Mr. Steven Collora, Dr. Richard Lanman and Ms. Danielle Usilton.

121.   For example, during several meetings and interviews in Florida and Texas, Guardant

assured Mr. Carroll that he would have great flexibility in hiring and managing his future sales team.  Guardant made these representations because they knew Mr. Carroll was on the fence, and they wanted him to accept their contract offer.

122.    In reliance on these and other misrepresentations, Mr. Carroll did accept the offer.

123.    Mr. Carroll was hesitant to accept the offer based on the reduction in compensation; however, after looking at Guardant's offer in the long run, Mr. Carroll reasonably thought the room for professional growth at Guardant would be better for his career than staying at Veracyte.

124.    This "room for growth" was nothing more than a misrepresentation by Guardant, uttered for no other reason than to hire a stronger candidate than they could if they had told Mr. Carroll the truth.

125.    Mr. Carroll suffered great financial injury as a proximate cause of these misrepresentations.

## PRAYER FOR RELIEF

**WHEREFORE**, Bill Carroll hereby respectfully requests that this Honorable Court:

i.      enter judgment in Plaintiff's favor and against Defendant Guardant on all claims asserted against it above in an amount in excess of $75,000;

ii.     order appropriate equitable relief;

iii.    ordering Defendant to compensate Plaintiff Bill Carroll with a rate of pay and other benefits and emoluments of employment to which he would have been entitled had he not been subjected to unlawful discrimination, harassment, and retaliation, plus interest due thereupon;

iv.     ordering Defendant to compensate Plaintiff for emotional distress suffered as a result of their unlawful actions;

v.      punitive damages;

vi.     ordering Defendant to pay Plaintiff's attorneys' fees; and

vii.    grant such other and further relief as this Court deems necessary, just, and

appropriate.


Dated:  June 29, 2020                    Respectfully submitted,

                                         **GRIESING LAW, LLC**

                                         By:   */s/ Francine F. Griesing*
                                         FRANCINE FRIEDMAN GRIESING, ESQ.
                                         EDWARD T. FISHER, ESQ.
                                         MELISSA HAZELL DAVIS, ESQ.
                                         Identification Nos. 48982, 86652, & 318298
                                         1880 John F. Kennedy Boulevard, Suite 1800
                                         Philadelphia, PA  19103
                                         PH: (215) 618-3720
                                         F: (215) 814-9049
                                         fgriesing@griesinglaw.com
                                         efisher@griesinglaw.com
                                         mdavis@griesinglaw.com
                                         *Attorneys for Plaintiff Bill Carroll*