**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BILL CARROLL** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  20-3183** |
| | : | |
| **GUARDANT HEALTH, INC.** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                                   **January 5, 2021**

Employment discrimination arises in many forms. We today address discrimination claims and evidence adduced by a fifty-seven-year-old sales executive fired by his employer after weeks on the job. The employer now seeking judgment as a matter of law dismissing a terminated employee's discrimination claims must demonstrate no genuine issue of material fact. We are often called upon to decide whether the employer's stated reason for terminating the employee is pretext, or a cover-up, for discrimination against the employee based on his age or gender. We are not a super-personnel oversight department second-guessing an employer's decision. But we must refer credibility decisions on genuine issues of material fact to trial if we find demonstrated inconsistencies in the employer's practices which could suggest disparate treatment of the former sales executive. We do so today as to the sales executive's claim for discrimination based on his age.

Our issue arises from a national medical testing employer with a uniform human resources policy firing an at-will fifty-seven-year-old sales executive within weeks of recruiting him. His performance over his first weeks played no role in his firing. The employer fired him only because co-workers quoted him as asking, "what the f*** is Lesli's problem?" and referring to women co-workers as "gals" or "f***ing chicks." The sales executive claims he never said these words. He swears the male and female co-workers lied because they did not like him as the

new guy recruited and mentored by the employer's influential chief medical director. The parties do not tell us when he allegedly made these statements or when they reported these statements to their supervisors. The sales executive's male supervisor and others investigated the alleged statements shortly after his colleagues exchanged text messages critical of the sales executive. The supervisor shortly thereafter decided to fire him. The parties dispute whether the supervisor made his decision without affording him an independent investigation, an opportunity to specifically address the challenged remarks, or imposing less severe corrective action seemingly consistent with discipline under the employer's policy and past investigations of similarly situated men for gender-based physical and verbal harassment directed at women.

Following discovery, the adduced evidence confirms the employer did not similarly fire at least three younger males for their disputed physical and verbal harassment of female employees. It instead investigated the contradicted charges, prepared internal memoranda, and issued warnings or counseling consistent with its human resources policy. While true the investigated younger males worked for different departments with different supervisors, the employer required all employees be similarly subject to the same standards and training to ensure a full, fair and proper investigation of gender-based harassment claims against co-workers.

The sales executive adduces genuine issues of material fact as to whether his former employer discriminated against him on the basis of his age on a disparate treatment theory. The sales executive otherwise does not offer genuine issues of material fact precluding summary judgment as a matter of law dismissing his claims for: retaliation on the basis of his age; discrimination or retaliation on the basis of his sex; breach of contract; fraudulent inducement; defamation; and tortious interference with contractual relations.

2

I.      **Undisputed Facts**[1]

Bill Carroll is a fifty-seven-year-old man experienced in biotechnology and pharmaceutical sales.[2] Mr. Carroll worked as a Senior Regional Sales Director, Northeast-Midwest for Veracyte, Inc. in early 2019.[3] Mr. Carroll earned between $350,000 to $400,000 in Veracyte stock options by early 2019.

In spring 2019, Richard B. Lanman, Jr., M.D., Chief Medical Officer of Guardant Health, Inc., contacted Mr. Carroll regarding a position at Guardant.[4] Guardant, a precision oncology company, developed a blood test to enable timely therapy selection for cancer patients.[5] Dr. Lanman knew Mr. Carroll from their twenty-year friendship, including working together at Veracyte, and Mr. Carroll considered Dr. Lanman a mentor.[6]

On Dr. Lanman's recommendation, Mr. Carroll flew to Texas and interviewed for the Regional Sales Director position at Guardant.[7] Mr. Carroll interviewed with Steven Collora, Vice President of United States Oncology Sales.[8] Mr. Collora told Mr. Carroll he "[saw] the company going a long way"; "he's building a team that's going to last"; and "we're going to be here for a while."[9] He also "sold [Mr. Carroll] on . . . the future of the company," and told Mr. Carroll "the company would be better with [him], and that's why he wanted to get [him] in."[10] Mr. Carroll made clear to Guardant he would not leave Veracyte, including $350,000 to $400,000 in existing stock options, to take a position with Guardant unless "they" assured him of a long-term opportunity, and he told Danielle Usilton, National Sales Director, he wanted to be "100 percent certain" he had a position at Guardant before resigning from Veracyte.[11] Mr. Collora and Ms. Usilton led him to believe Guardant wanted him to be part of the company "long-term" and help grow Guardant over the next decade.[12] Mr. Carroll claims Guardant, through Mr. Collora's and Ms. Usilton's comments during the interview process, fraudulently

induced him to leave his position at Veracyte to accept the Regional Sales Direction position at Guardant.

*Mr. Carroll signs Guardant's Employee Handbook ten days before resigning from Veracyte.*

In late May or early June 2019, Mr. Carroll reviewed Guardant's Employee Handbook, which included an employee acknowledgment section confirming, among other things:

- he received the Employee Handbook and is responsible for reading it and complying with its policies;

- the Employee Handbook provides "guidelines only and are not intended to create any contractual rights or obligations, express or implied . . .";

- his "employment with [Guardant] is at-will and not guaranteed for a specified length of time and can be terminated at any time, for any reason or for no reason, with or without cause or notice, by me or the company."

- "no statements or representations regarding my employment can alter this policy."

- "this Acknowledgment contains a full and complete statement of the agreements and understandings that it recites, that no one has made any promises or commitments to me contrary to the foregoing, and that this Acknowledgment supersedes all previous agreements, whether written or oral, express or implied, relating to the subjects covered in this Acknowledgment."[13]

Mr. Carroll signed the employee acknowledgment on June 3, 2019.[14] As Mr. Carroll's counsel admitted during oral argument, Mr. Carroll signed the Acknowledgment confirming a potential position as an at-will executive approximately ten days before he resigned from Veracyte.

Guardant's Employee Handbook signed by Mr. Carroll before he resigned from Veracyte and weeks before accepting employment with Guardant contains a section entitled "Reporting and Investigating Harassing Conduct" providing, in part:

- incidents of harassment should be reported to Human Resources, which is responsible for investigating harassment complaints;

- every reported complaint of harassment will be investigated thoroughly and promptly;

- the investigation will include an interview of the employee who lodged the harassment complaint to obtain complete details regarding the alleged harassment, and interviews of anyone who is alleged to have committed the acts of harassment to respond to the claims as well as interviews of employees who may have witnessed, or who may have knowledge of, the alleged harassment;

- Human Resources, or other company official responsible for the investigation, will notify the employee who lodged the harassment complaint of the results of the investigation; and

- the investigation will be handled in as confidential a manner as possible consistent with a full, fair, and proper investigation.[15]

### Guardant offers Mr. Carroll employment as an at-will Sales Director.

Following background checks, Guardant offered Mr. Carroll the position of Guardant Regional Sales Director reporting to National Sales Director Danielle Usilton on June 26, 2019.[16] Guardant's offer detailed, among other items, Mr. Carroll's salary and benefits and confirmed his June 3, 2019 understanding of at-will employment, specifying: employment with Guardant is "for no specified period and constitutes at-will employment" terminable by either party; Guardant "is free to conclude its employment relationship with you at any time, with or without cause, and with or without notice"; and "[t]his policy of at-will employment is the final and entire agreement as to how your employment may be terminated and may only be modified in an express written agreement signed by the Chief Executive Officer of the Company that expressly changes your at-will status."[17] Mr. Carroll signed the offer confirming his acceptance on June 27, 2019.[18]

### Mr. Carroll begins his position as Regional Sales Director.

Mr. Carroll began working for Guardant as Regional Sales Director on July 15, 2019.[19] He became Guardant's oldest Regional Sales Director on the team.[20] As Regional Sales Director, Guardant expected Mr. Carroll to manage five sales team members consisting of one man and

five women: Joe Bianco; Pam Olsen; Kim Johnson, Candace Steed, and Vicki Lionberger.[21] Mr. Carroll planned to assume management of Mr. Bianco and Ms. Olsen from Leeann Barlow, who recently received a promotion to a Regional Sales Director position.[22]  Ms. Usilton "envisioned a synergy between" Mr. Carroll and Ms. Barlow working closely together.[23]

Mr. Carroll and his sales team worked with the medical affairs team on the same accounts. Two women, Lesli Kiedrowski and Becky Nagy, worked in medical affairs and partnered with sales team members, including Ms. Olsen and Mr. Bianco, and Regional Sales Director Ms. Barlow.[24]

Guardant Vice President Collora told Mr. Carroll of his impression Ms. Olsen and Mr. Bianco needed improvement in their work performances and expected their improvement to be one of Mr. Carroll's objectives.[25] Mr. Collora felt Ms. Olsen "needed to grow her community business" beyond her academic accounts at hospitals such as the University of Pennsylvania and Thomas Jefferson.[26]  Mr. Collora told Mr. Carroll to put Mr. Bianco on a performance improvement plan or terminate him because of performance issues.[27]

### Undated reports of Mr. Carroll's references to female co-workers.

At some point after Mr. Carroll began work on July 15, 2019, Ms. Olsen, Mr. Bianco, Ms. Barlow, and Ms. Kiedrowski all complained to unidentified persons about allegedly offensive statements Mr. Carroll made when referring to female co-workers at some unidentified time. The parties do not tell us when Mr. Carroll allegedly made the three challenged statements or when his co-workers complained.  As adduced in discovery, all we know is Guardant learned of allegations:

1. Mr. Carroll asked Ms. Olsen: "What the f*** is Lesli's problem?" referring to medical affairs team member Lesli Kiedrowski.[28] Ms. Olsen felt uncomfortable about the alleged comment and reported it to Ms. Barlow.[29]

2.  Mr. Carroll commented to Mr. Bianco: "I've never worked for a f***ing chick before."[30] Mr. Bianco felt this comment to be unprofessional and reported it to Ms. Barlow who in turn reported it to Ms. Usilton.[31]

3.  Mr. Carroll used the word "gals" on a few occasions and allegedly referred to the sales team with "so many gals" in conversations with Ms. Barlow and Ms. Kiedrowski.[32] Ms. Barlow, who felt uncomfortable with the word "gal," reported it to Ms. Usilton,[33] who in turn reported the comments to Mr. Collora.[34] Ms. Kiedrowski, offended by the use of the word "gal," reported it to the Vice President of Human Resources Ms. Merrill.[35]

Mr. Carroll denies ever making these comments or using the words "chick" or "gal." Mr. Carroll did not know who made the complaints about him until discovery in this case.[36]

At some unidentified time, Mr. Carroll had a business call with Ms. Kiedrowski and Ms. Olsen, which Ms. Kiedrowski did not like. Ms. Kiedrowski took issue with Mr. Carroll using the word "we" when referring to his previous experience at Veracyte. By Mr. Carroll's testimony, Ms. Kiedrowski called him and said "are you open for some constructive" feedback and told him use of the word "we" when referring to Veracyte is offensive because "we" is Guardant.[37]

### Text messages referring to Mr. Carroll.

Ms. Usilton, Ms. Olsen, Ms. Kiedrowski, and Mr. Bianco communicated by text on August 22 and 23, 2019 regarding a variety of issues including Mr. Carroll. Guardant fired him within ten days of these messages although the parties do not adduce evidence of a nexus between these texts and the decision to fire Mr. Carroll. Mr. Carroll instead argues the messages evidence age and sex bias, including a hostile work environment:

1.  In a text exchange between Ms. Kiedrowski and Ms. Barlow, Ms. Kiedrowski said Mr. Carroll "Talks. So. Damn. Much." and referred to him as "the male Karen."[38]

2.  In a text exchange between Ms. Kiedrowski and Ms. Barlow, Ms. Kiedrowski said Mr. Carroll "is exhausting" to which Ms. Barlow responded, "My new strategy is to avoid him like the plague."[39]

3. In a text exchange between Mr. Bianco and an unidentified person, someone said Mr. Carroll is "the worst."[40]

4. In a text exchange between Ms. Olsen and an unidentified person, Ms. Olsen said, "Nice to see you and Lesli bonding over something," possibly referring to their mutual feeling about Mr. Carroll.[41]

### *Guardant's investigation into Mr. Carroll's alleged comments in late August 2019.*

Guardant began investigating Mr. Carroll's language and conduct towards female employees in late August 2019. Neither party explains why Guardant began investigating Mr. Carroll in later August and possibly only after the text messages. Mr. Collora, Ms. Usilton, Ms. Merrill, and one other member of Guardant's human resources department, managed the investigation into the complaints about Mr. Carroll's alleged comments.[42] Mr. Collora, Ms. Usilton, and Ms. Merrill planned for Ms. Usilton to interview Ms. Olsen and Ms. Barlow. Mr. Collora and Ms. Usilton would also interview Mr. Bianco, and Mr. Collora would speak to Mr. Carroll regarding the allegations.[43]

Guardant's policy outlines investigative techniques to ensure a full, fair, and proper investigation. The parties adduced evidence of Guardant's objectives and steps for gender based workplace investigations in place before investigating Mr. Carroll's comments about women.[44] Guardant's procedures admit any investigation "will be put under intense scrutiny" in litigation.[45] It requires the investigator "normally [an] HR person" to interview the accused, identify and interview other witnesses, [and] report findings and potential corrective action.[46] The corrective action must be "reasonably calculated to prevent the harassment from occurring again."[47] Corrective action ranges from the most lenient measure of coaching/counseling, to verbal warning, written warning, suspension, and then termination, which Guardant directs is

"normally not required unless it is the only action that could reasonably be expected to stop the harassment."[48]

The parties also adduced evidence of other men investigated for alleged inappropriate gender-based conduct. For example, approximately five years before terminating Mr. Carroll, Guardant investigated accusations by a female employee against a forty-one-year-old male employee holding the position of Principal Scientist in the Bioinformatics department supervised by Guardant's President.[49] The forty-one-year-old scientist allegedly inappropriately touched and caressed the female employee and made inappropriate comments such as asking her to attend a training away from the office and suggesting they "hav[e] fun together."[50] Guardant's investigator (not the accused male's supervisor) spoke to the female and corroborated the inappropriate touching "on multiple occasions."[51] Guardant recorded the investigation findings and outcome in memoranda written by Guardant's President to the involved employees. Guardant decided to discipline the accused forty-one-year-old male through counseling rather than through any other more serious corrective action, including termination.[52] Guardant went a step further and also required "all supervisors of the Company" must attend a two-hour harassment prevention training session.[53] Guardant did not excuse a supervisor from this mandated training. But Guardant did not fire anyone.

The next example presented to us occurred shortly before Guardant learned of the allegations against Mr. Carroll. Guardant hired an independent third party investigator to review gender-based discrimination in late 2018 and early 2019.[54] The investigator found a thirty-nine year old male supervisor's comments towards a female employee adversely affected their working relationship. The third-party investigator interviewed witnesses but did not interview the accuser. Despite the woman's allegations, the investigator found the thirty-nine-year-old

supervisor exercised his business judgment and his conduct did not appear to be gender related. The investigator communicated her findings of no discrimination to the female employee, and Guardant did not discipline the thirty-nine-year-old male supervisor. Guardant offered the female employee the choice to move and be mentored or stay in her current position.[55]  Guardant did not fire anyone after the investigation.

In May 2020 (eight months after terminating Mr. Carroll), Guardant investigated a female employee's allegation of discrimination and retaliation by a forty-eight-year-old male employee who allegedly used a derogatory term about women.[56] At the time of the investigation, the forty-eight-year-old man held the position of Vice President, BioPharma Business Development, supervised by Senior Vice President Daniel Simon.[57] Guardant did not terminate this forty-eight-year-old male after investigation. It instead issued a stern warning to him even though Guardant could not corroborate derogatory language. And it reminded the complaining female of the decision by "Connected Women of Influence" to recognize Senior Vice President Simon as one of four finalists for the Catalyst for Change at the 2020 Women of Influence Awards two months earlier. Guardant did not describe its investigation; it only issued a stern warning to the male but fired the complaining female.[58] Guardant did not fire the supervisor.

The only evidence of Mr. Collora's direct involvement in another disciplinary issue involves his terminating a female District Sales Manager performing the same duties expected of Mr. Carroll as a Regional Sales Director.[59] The parties do not disclose her age. Mr. Collora swears he terminated her based on other employees saying she made an unprofessional comment about doing her nails during a business call.[60] He did not speak to her and did not prepare an investigative report.[61]

Turning to Mr. Carroll's investigation, Ms. Usilton spoke to Ms. Barlow at least twice about Mr. Carroll's alleged comments asking, "Hey, you know, this is serious. Right? I need to know exactly what happened. So, you know, double-check if not triple-check that."[62] Ms. Barlow testified she confirmed to Ms. Usilton her certainty regarding hearsay reports of Mr. Carroll's comments.[63]

Mr. Collora interviewed Mr. Bianco who confirmed Mr. Carroll's alleged "f***ing chick" comment.[64] Mr. Collora testified he "pressed [Mr. Bianco] incredibly hard" to determine Mr. Bianco's truthfulness given his deficient work performance, even telling Mr. Bianco he will be terminated if he lied about Mr. Carroll's alleged comments.[65]

The parties do not tell us whether Mr. Collora, Ms. Usilton, or Ms. Merrill interviewed Ms. Olsen despite planning to do so. Ms. Olsen later testified she knew "something happened" regarding Mr. Carroll's alleged comments but it "didn't happen to [her]"; she heard only the "what the f*** is Lesli's problem?" comment; she "relayed" this comment to Ms. Barlow but did not "officially ask to report" it; she made no formal complaint against Mr. Carroll; and, she made no other report of any other alleged comment by Mr. Carroll.[66]

Mr. Collora called and asked Mr. Carroll on August 29, 2019 if he ever used the word "chicks."[67] Mr. Carroll disputes the exact question Mr. Collora asked, instead asserting Mr. Collora asked him if he said he worked on a team "with a bunch of chicks."[68] Mr. Carroll denied using the word "chicks" and told Mr. Collora he does not use the word "chicks" to refer to women.[69] After Mr. Carroll denied using the word "chicks," Mr. Collora responded he did not believe it to be in Mr. Carroll's character to use the word "chick."[70] Mr. Collora did not ask Mr. Carroll if he used the words "f***" or "f***ing."[71]

The parties dispute several material aspects of this call.  Mr. Collora testified he gave Mr. Carroll "multiple chances" during their conversation where Mr. Collora asked Mr. Carroll "multiple times the same question."[72] Mr. Collora testified Mr. Carroll initially denied using the word "chick" but then "wavered at the end where he said he could have said that."[73] Mr. Collora further testified, "I have made it clear that, you know, we conducted and asked via multiple challenges, multiple people. Everybody corroborated the same thing. And to hear from [Ms. Barlow], to hear from [Mr. Bianco], to hear from Pam Ranallo, to hear from [Ms. Usilton], to hear from the people team, and then to hear Mr. Carroll's wavering in his own answer, solidified for me my position that we were making the appropriate decision."[74]

Mr. Carroll contends during their August 29, 2019 telephone call, Mr. Collora never told Mr. Carroll of an investigation, did not take notes, and did not discuss Mr. Carroll's performance.[75] Guardant admits in part this assertion, denying only the assertion Mr. Collora never told Mr. Carroll of an investigation as "not supported by the cited record" and brushes off the assertions as "not a material fact relevant" to Mr. Carroll's claims.[76]

Mr. Carroll claims Guardant published the statements attributed to him both inside and outside the company. He argues Mr. Collora testified only he (Mr. Collora), the human resource department, and Ms. Usilton took part in the investigation into the statements attributed to him. But, he claims, Guardant published these statements to Becky Nagy, Senior Director of Medical Affairs team who did not have a role in the investigation as evidenced by a text message between Ms. Usilton and another member of the sales team in which Ms. Usilton texted, "S***. I talked to Becky."[77]

Mr. Carroll also claims Guardant published the statements attributed to him outside the company to former colleagues from Veracyte, Matt Lemiuex and Shane Nelson, who heard

"through the grapevine" Guardant terminated Mr. Carroll for making derogatory comments.[78] He also believes David James, a former colleague, heard about the reason for his termination from Guardant.[79]

### *Guardant terminated Mr. Carroll and replaced him with a younger man.*

Mr. Collora decided to terminate Mr. Carroll, and Guardant did so on September 3, 2019.[80] Guardant terminated Mr. Carroll "based on the statements he made about women."[81] Guardant did not cite lack of performance or any other reason. Guardant replaced Mr. Carroll with thirty-seven-year-old David Liebetreu.[82]

### *Guardant's alleged post-termination conduct.*

Mr. Carroll eventually sued Guardant on June 29, 2020. Mr. Carroll claims Guardant repeatedly threatened him with liability and attorney's fees if he continued to pursue his claims.[83] The parties do not tell us when Guardant allegedly made these threats. In Guardant's March 17, 2020 position statement to the Equal Employment Opportunity Commission, Guardant's attorney addressed the retaliation claim: "Mr. Carroll's allegation that the Company retaliated against him by threatening to seek legal fees is without merit. Guardant is entitled to proceed with this in response to a frivolous action. . . .."[84]

## II.    Analysis

Mr. Carroll sued Guardant for terminating him because of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, on the basis of his sex in violation of Title VII, 42 U.S.C. § 2000e-2, and in violation of the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.*, for age and sex discrimination, as well as state law contract and tort claims. He denies ever using the words "chicks" or "gals" and contends Mr. Bianco, Ms. Olsen, and Ms. Barlow, who are younger and female (except for Mr. Bianco),

fabricated their statements to "get him fired" because they resented Mr. Carroll "upsetting the status quo" and his close relationship with Dr. Lanman. Mr. Carroll argues Guardant, through Mr. Collora, performed a sham investigation and did not conduct a full and fair investigation of the alleged comments, and the stated reason for terminating him is pretext for age and sex discrimination. He also claims Guardant breached a contract of employment, fraudulently induced him to leave his employer and join Guardant, published defamatory statements about him, and interfered with his employment contract.

Guardant moves for summary judgment on all claims.[85] Mr. Carroll argues genuine issues of material fact preclude summary judgment.

### A.   We grant in part and deny in part summary judgment on Mr. Carroll's discrimination claims under ADEA .[86]

Mr. Carroll's age-based discrimination claim is based on four theories: (1) a disparate treatment discriminatory termination because of his age; (2) harassment because of his age; (3) retaliation in the form of threatening him with financial damages and attorney's fees if he pursued his legal action because he complained about discrimination and harassment; and, (4) Guardant's facially neutral practices, policies, and/or customs have a disparate impact on employees over forty years old.[87] We grant its motion for summary judgment on Mr. Carroll's age-based claims under theories of harassment, retaliation, and disparate impact. We deny summary judgment on Mr. Carroll's age-based disparate treatment claim because there are genuine issues of material fact created by Guardant's inconsistencies in its investigations of gender-based conduct compared to its policies.

      1.      **Genuine issues of material fact preclude summary judgment on the disparate treatment claim.**

Congress, through ADEA, makes it unlawful for an employer to "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."[88] To prevail on an ADEA claim, Mr. Carroll must establish, by a preponderance of the evidence, age is the "but-for" cause of his termination.[89]  Mr. Carroll must prove his case under the three-part burden shifting analysis of *McDonnell Douglas Corp. v. Green*.[90]

Under the *McDonnell Douglas* framework, Mr. Carroll must first establish a *prima facie* case of discrimination. Satisfying the *prima facie* case creates an "inference of unlawful discrimination."[91] To establish a *prima facie* case of discrimination, Mr. Carroll must show: (1) he is at least forty years old; (2) he suffered an adverse employment action; (3) he is qualified for the position; and (4) replacement by another employee sufficiently younger to support an inference of discriminatory motive.[92]

If Mr. Carroll satisfies his burden of showing a *prima facie* case of discrimination, the burden shifts to Guardant to "articulate a legitimate nondiscriminatory reason for the adverse employment action."[93] Guardant's burden is "'relatively light'" and "is satisfied if [it] provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason."[94]

If Guardant articulates a legitimate, nondiscriminatory reason for Mr. Carroll's termination, the burden shifts back to Mr. Carroll to "provide evidence from which a factfinder could reasonably infer [Guardant's] proffered justification is merely a pretext for discrimination."[95] To show pretext, Mr. Carroll "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [Guardant's]

articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Guardant's] action."[96]

### Mr. Carroll establishes a prima facie case of age discrimination.

Guardant argues Mr. Carroll does not establish the fourth element of a *prima facie* case of age discrimination. It argues Mr. Carroll adduced no evidence raising an inference of discrimination because Mr. Collora hired and fired him in less than two months;[97] we cannot infer discrimination from Mr. Carroll being the oldest Regional Sales Director; and we cannot infer discrimination because the younger David Liebetreu replaced him.

Mr. Carroll responds he meets the fourth element of the *prima facie* case because Guardant replaced him with the thirty-seven-year-old Mr. Liebetreu; Mr. Collora testified he considers the term "gal" inappropriate language because it is "not 1910";[98] a group of younger, predominately female co-workers conspired against him to "peripheralize and ostracize him"; and, Guardant failed to conduct an "actual and true investigation . . . as it normally did when the accused was younger and/or female."

Mr. Carroll's burden at the *prima facie* stage "is low and may be satisfied by presenting facts sufficient to show [he] was in fact replaced with a sufficiently younger employee."[99] There is no dispute Guardant replaced Mr. Carroll with Mr. Liebetreu, twenty years younger than Mr. Carroll. This evidence meets the fourth element of the *prima facie* case.[100] Having satisfied his *prima facie* case, the burden shifts to Guardant to articulate a legitimate non-discriminatory reason for its decision to terminate Mr. Carroll.

### Guardant established a legitimate nondiscriminatory reason for terminating Mr. Carroll.

Under the *McDonnell Douglas* framework, Guardant next has the burden to produce a legitimate, nondiscriminatory reason for Mr. Carroll's termination. Guardant's burden is one of

production, not of persuasion and our analysis "can involve no credibility assessment."[101] "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."[102]

Guardant identifies its legitimate, nondiscriminatory reason for terminating Mr. Carroll's at-will employment as his unprofessional and offensive comments: "What the f*** is Lesli's problem?"; "I've never worked for a f***ing chick before"; and use of the term "gals" when referring to women.[103]  Guardant contends Mr. Carroll's sales and medical affairs teams reported these comments, Guardant investigated, and, upon finding Mr. Carroll made the comments attributed to him, terminated him.

### *Fact issues preclude summary judgment on pretext.*

Having found Guardant offers a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to Mr. Carroll to show Guardant's stated reason is pretext for age discrimination. Under *Fuentes*, Mr. Carroll must provide us with some evidence, direct or circumstantial, from which the factfinder could reasonably either (1) disbelieve Guardant's articulated legitimate reason; or (2) believe an invidious discriminatory reason is more likely than not a motivating or determinative cause of Guardant's action. To establish pretext by the first *Fuentes* prong, Mr. Carroll must show "weaknesses, implausibilities, incoherencies, or contradictions" in Guardant's proffered reason "[such] that a reasonable factfinder *could* rationally find them 'unworthy of credence.'"[104] To establish pretext by the second *Fuentes* prong, Mr. Carroll "must point to sufficient evidence that, notwithstanding [Guardant's] stated reason for the adverse action, 'an invidious discriminatory reason' actually caused the action."[105]

Mr. Carroll argues pretext under the first *Fuentes* prong, urging us to find the adduced evidence would allow the factfinder to reasonably disbelieve the stated reason. He argues this disbelief can arise from finding: (1) he never made the comments others attributed to him; (2) Guardant conducted a sham investigation in contrast to its typical practices; (3) text messages between the younger, mainly female co-workers who attributed comments to him reflect their bias; (4) Mr. Collora testified he considers the word "gal" to be inappropriate because it is "not 1910"; and (5) even considering the findings of the "sham" investigation, Guardant could not reasonably believe Mr. Carroll made the comments attributed to him.

Mr. Carroll can demonstrate pretext by presenting direct and circumstantial evidence Guardant did not follow its own policies on resolving gender-based misconduct allegations as confirmed by the way it treated similarly situated persons more favorably.[106] Evidence of the inconsistency between Guardant's investigation into the comments attributed to Mr. Carroll compounded by a comparison of investigations into the behavior of the three other men who acted inappropriately towards their female colleagues may support a showing of pretext.[107] In this Circuit, the "mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual."[108] But we have more here; Guardant has a policy of how to investigate harassment. The record shows Guardant did not follow the policy with Mr. Carroll but did follow it (at least in part) with regard to the three younger men accused of inappropriate conduct. There is a fact issue regarding Guardant's treatment of Mr. Carroll both in its investigation and discipline level versus its treatment of the three younger men.

Recognizing deviation from a policy alone will not demonstrate pretext for discriminatory animus, Mr. Carroll also argues Guardant's treatment of three similarly situated men investigated for physical or verbal harassment of female employees is evidence of an inconsistency which could lead to a finding of pretext. Our Court of Appeals instructs "similarly situated" does not mean "identically situated" but "the comparator must be similar in all relevant respects."[109] "Which factors are relevant is determined by the context of each case, but often includes a 'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'"[110] "Similarly situated" comparators "must have committed offenses of 'comparable seriousness.'"[111] "Whether comparators are similarly situated is generally a question of fact for the jury" but "summary judgment is appropriate where there is no evidence from which a jury could conclude the parties were similarly situated."[112]

Mr. Carroll argues Guardant investigated accusations by a female employee against a forty-one-year-old male employee in 2014 who allegedly inappropriately touched her and made inappropriate comments while holding the position of Principal Scientist in the Bioinformatics department supervised by Guardant's President.[113] Guardant recorded the investigation findings and outcome in memoranda to the involved employees and decided to discipline the accused forty-one-year-old man through counseling, rather than termination.[114]

Approximately two months before terminating Mr. Carroll, Guardant investigated an allegation of discrimination and retaliation by a female employee against a thirty-nine-year-old male employee[115] who then held the position of Vice President, Clinical Development supervised by Guardant's President .[116] Guardant retained an independent third-party

investigator who found insufficient evidence involving the thirty-nine-year-old man to support a discrimination claim.[117]

In May 2020 (eight months after terminating Mr. Carroll), Guardant investigated a female employee's allegation of discrimination and retaliation by forty-eight-year-old male employee who allegedly used the word "b****" at a Guardant event.[118] At the time of the investigation, the forty-eight-year-old man held the position of Vice President, BioPharma Business Development supervised by Daniel Simon, Senior Vice President, BioPharma Business Development.[119] Guardant did not terminate this man after investigation.

Mr. Carroll argues the three younger men are similarly situated to him even though those men work in different positions, different departments, and have different supervisors. He argues they are all Guardant male employees subject to an investigation into gender-based misconduct under the uniform human resources policy. His counsel admitted at oral argument the nexus goes no further than they are male employees in the same company subject to the same policy.

Guardant argues these younger men are not "similarly situated" and are not proper comparators because they did not hold the same position, worked in different departments, and had different supervisors than Mr. Carroll. Guardant argues different supervisors can investigate differently. Guardant's counsel conceded at oral argument the company's policy for investigating complaints is the same and resides in the "Reporting and Investigating Harassing Conduct" policy in the Employee Handbook.[120] It further argues even if the three younger men are similarly situated, Mr. Carroll fails to show Guardant treated them differently. It points to (1) a letter written by Guardant's counsel summarizing the investigation of one of the men;[121] (2) a letter written by Guardant's counsel in response to a demand made by an accuser of one of the men;[122] and, (3) two memoranda written by Guardant's President to the accuser and the accused

regarding the investigation into inappropriate touching and comments.[123] Guardant argues there is nothing in these documents indicating differences in the investigation methodology applied to Mr. Carroll and, like the three younger men, Guardant gave Mr. Carroll a full investigation.

Guardant's counsel conceded at oral argument its harassment policy applies to all employees and argued Guardant followed the policy when investigating the three younger men and Mr. Carroll. Counsel argued the policy is just that–a policy–and there is no requirement for written documents. The fact remains, however, the documentary evidence appears to show Guardant afforded the three younger men a more fulsome investigation, particularly regarding the forty-one-year-old male employee who allegedly inappropriately touched a female colleague and made inappropriate comments. Although alleged to have physically touched a female co-worker–possibly a more serious allegation than use of potentially offensive use of the words "gal" and "chicks"–Guardant disciplined him through counseling rather than termination. Guardant provided counseling to the three younger men afforded a more fulsome investigation; Guardant fired Mr. Carroll without the same level of investigation. A jury could find Guardant used the different and possibly truncated investigation to remove an older worker when it engaged in a more fulsome investigation to save the jobs of younger workers whose conduct arguably could be viewed as just as concerning or even more so than Mr. Carroll's alleged statements.  For example, Mr. Carroll swears he denied these allegations to Mr. Collora; we do not know what steps Guardant took to evaluate his denials other than not believing him. We are not second-guessing Guardant's discretion so long as its methodology is fairly consistent between an older employee like Mr. Carroll and the three younger employees. These inconsistencies arising from deviations from policy combined with the varied approaches in investigating and disciplining the three younger men accused of gender-based misconduct raise a

fact question regarding pretext. The factfinder could see the same standards applying to all four men and similar gender-based allegations of misconduct and fairly evaluate whether firing Mr. Carroll is pretext for age discrimination on a disparate treatment theory.

We are not suggesting the factfinder will believe Mr. Carroll's testimony regarding the call with Mr. Collora, which purportedly afforded him an opportunity to refute the allegations. Given the standards applied today on a summary judgment record, we cannot find as a matter of law Guardant did not deviate from its mandated uniform policies and possibly truncated its investigation without memoranda of Mr. Carroll compared to other younger supervisors. We deny summary judgment on the ADEA and age based PHRA disparate treatment claims.

  **2. We enter judgment in favor of Guardant dismissing age-based hostile work environment claims.**

Mr. Carroll alleges Guardant intentionally and willfully discriminated against and harassed him because of his age.[124] To the extent Mr. Carroll intended to allege an age-based hostile work environment, he failed to brief it. At oral argument, Mr. Carroll's counsel argued text messages from Ms. Barlow and Ms. Kiedrowski, specifically the "male Karen," talking too much, and "avoid him like the plague" comments, and their fabricated allegations evidence a hostile work environment.

To prevail on a hostile work environment claim under ADEA, Mr. Carroll must show: "(1) he suffered intentional discrimination because of his age; (2) the harassment was severe or pervasive; (3) the harassment detrimentally affected him; (4) the harassment would detrimentally affect a reasonable person in that position; and (5) *respondeat superior* liability."[125] "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' Instead, a hostile work environment requires conduct that is 'severe or pervasive enough to create an objectively hostile

or abusive work environment—an environment that a reasonable person would find hostile or abusive[.]'"[126] Conduct must be "permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ."[127]

Although Mr. Carroll alleged harassment because of his age, he did not brief an ADEA hostile work environment claim. He fails to point us to any evidence of intentional discrimination because of his age, based on severe or pervasive harassment, harassment detrimentally affecting him, harassment that would detrimentally affect a reasonably person in his position, and *respondeat superior* liability. The text messages he points to do not evidence an age bias and are neither severe nor pervasive. Comments such as the "male Karen", talking too much, and "avoid him like the plague" are not severe or pervasive to create an objectively hostile or abusive work environment. We enter judgment in favor of Guardant on Mr. Carroll's hostile work environment or harassment claim under ADEA.

### 3. We enter judgment in favor of Guardant dismissing the retaliation claims under ADEA.

Mr. Carroll alleges he complained about discrimination and harassment,[128] but there is no evidence of what he complained about, to whom he made the complaints, and when he did so. He did not brief his ADEA retaliation claim.

A plaintiff asserting a retaliation claim under ADEA must first establish a *prima facie* case under the *McDonnell Douglas* framework by showing: "(1) he engaged in protected activities; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action."[129]

There is no evidence of protected activity. Mr. Carroll appears to claim Guardant retaliated against him post-termination by threatening him with financial damages and attorney's fees if he pursued his claims. He does not adduce evidence of a *prima facie* case of ADEA retaliation. There is no evidence of a protected activity, adverse action after or contemporaneous with protected activity, or a causal link between the protected activity and the adverse action. We enter judgment in Guardant's favor on Mr. Carroll's ADEA retaliation claim.

### 4.   We enter judgment in Guardant's favor dismissing a disparate impact theory under ADEA.

Mr. Carroll pleads "Guardant's facially neutral practices, policies, and/or customs had a disparate impact upon employees over the age of 40."[130] Although not developed, Guardant argues there is no evidence to support Mr. Carroll's "completely speculative assertion" Guardant's facially neutral practices, policies, and/or customs had a disparate impact on employees over the age of forty.[131]

To state a *prima facie* case for disparate impact under ADEA, Mr. Carroll must "(1) identify a specific, facially neutral policy, and (2) proffer statistical evidence that the policy caused a significant age-based disparity."[132]

Mr. Carroll does not identify a specific facially neutral policy supported by statistical evidence causing a significant age-based disparity. He did not brief a disparate impact theory of age discrimination. We enter judgment in favor of Guardant on a disparate impact theory.

### B.   We enter judgment for Guardant dismissing the sex discrimination claims.

Mr. Carroll claims Guardant terminated him on the basis of sex in violation of Title VII. He contends a group of mainly women "shunned" him because he is a man as evidenced by text messages among Ms. Barlow, Ms. Kiedrowski, Ms. Olson, and Mr. Bianco and contends these women and Mr. Bianco fabricated the "gals" and "chicks" comments in an effort to have him

terminated. Mr. Carroll contends the text messages evidence an anti-male bias notwithstanding Mr. Bianco's alleged participation in the text messaging and reporting of Mr. Carroll's alleged comment, "I've never worked for a f***ing chick before."

Under Title VII, it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."[133]

Like his age-based discrimination claims, Mr. Carroll's claim is based on four theories: (1) disparate treatment discriminatory termination because of his sex; (2) hostile work environment ("harassment") because of his sex; (3) retaliation through threatening him with damages and attorney's fees if he pursued this case; and, (4) Guardant's facially neutral practices, policies, and/or customs have a disparate impact on male employees.[134]

Guardant moves for summary judgment arguing Mr. Carroll cannot: (1) establish a *prima facie* case of sex discrimination; (2) establish pretext; (3) establish a hostile work environment based on sex; and (4) establish retaliation.[135] Mr. Carroll responds (1) he satisfies a *prima facie* case of sex discrimination; (2) there are fact questions precluding summary judgment on whether Guardant's legitimate, nondiscriminatory reason for his termination is pretext; and, (3) there are fact issues precluding summary judgment on his hostile work environment claim.[136] Neither Guardant nor Mr. Carroll addresses the disparate impact theory, and Mr. Carroll does not address his retaliation claim.

### 1. We grant summary judgment dismissing the disparate treatment claim.

Mr. Carroll argues there is "direct proof" of discrimination entitling him to the "mixed-motive" framework established by the Supreme Court in *Price Waterhouse v. Hopkins*.[137] Under

the *Price Waterhouse* "mixed-motive" framework, a plaintiff may show "an employment decision was made based on both legitimate and illegitimate reasons."[138]

He also argues he satisfies his burdens under the *McDonnell Douglas* burden-shifting framework to raise a genuine issue of material fact on whether Guardant's legitimate, nondiscriminatory reason for his termination–inappropriate comments–is a pretext for sex discrimination.

### The Price Waterhouse "mixed motive" theory.

Mr. Carroll's direct evidence of discrimination is Mr. Collora's deposition testimony characterizing use of the word "gal" as inappropriate because it is "not 1910." The context of Mr. Collora's testimony is:

Q.    Is calling a woman "gal," G-A-L, would you consider that harassment?

A.    I would consider it inappropriate language for, you know – not 1910.

Q.    What is that? Because –

A.    Because our – I think it's inappropriate language. That's why. I wouldn't refer to my daughter that way. I wouldn't refer to my wife that way. And –
. . .
You know, and furthermore, you know, it's about the context of how you're – of how you're speaking. And so, you know, I think in context with calling somebody "gal" or calling somebody a "f***ing chick" or – you know, frankly, having, you know, any violation of – of, you know, our rules of conduct as a company. It's pretty straightforward. Yeah.[139]

In addition to the "not 1910" comment, Mr. Carroll's counsel at oral argument also pointed to the following as direct evidence of discrimination: (1) his denial he used the words "gals" or "chicks"; (2) the fact women reported the comments about him; and (3) text messages among Ms. Barlow, Ms. Kiedrowski, Ms. Olson, and Mr. Bianco.

Our Court of Appeals describes a plaintiff's showing of direct evidence of discrimination a "high hurdle."[140] "Direct evidence of discrimination must be 'so revealing of [discriminatory]

animus that it is unnecessary to rely on the [*McDonnell Douglas*] burden-shifting framework, under which the burden of proof remains with the plaintiff.'"[141] "To qualify as direct evidence, 'the evidence must be such that it demonstrates that the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'"[142]

Direct evidence must satisfy two requirements: (1) "the evidence must be strong enough 'to permit the factfinder to infer that a discriminatory attitude was more likely than not a motivating factor in the [defendant's] decision'"; and (2) "the evidence must be connected to the decision being challenged by the plaintiff . . . Specifically, any statements made by a defendant's employees must be made at a time proximate to the challenged decision and by a person closely linked to that decision."[143] If a plaintiff meets the "high hurdle" of direct evidence of discrimination, "the defendant has the burden of producing evidence to show that it would have made the same decision in the absence of discriminatory animus."[144]

Mr. Carroll does not meet his burden of showing Mr. Collora's deposition testimony–the word "gal" is inappropriate because it is "not 1910"–is direct evidence of sex discrimination. Mr. Collora's post termination deposition testimony does not permit the factfinder to infer a sex-based discriminatory attitude is more likely than not a motivating factor in Guardant's decision. There is nothing sex-based about the "not 1910" testimony. We also fail to see how Mr. Carroll's denial of using alleged inappropriate words, incidents of women reporting perceived inappropriate comments regarding a man to their employers or the text messages constitute direct evidence of discrimination. This is particularly true where Mr. Bianco, a man, reported Mr. Carroll as using the phrase "f***ing chick" and also participated in the text messaging. Mr. Carroll fails to meet his initial burden of proving gender discrimination under the mixed-motive theory, and those claims fail.

### *McDonnell Douglas pretext theory.*

The *McDonnell Douglas* burden-shifting analysis applies to Mr. Carroll's sex-based discrimination claims.[145] Mr. Carroll must first establish a *prima facie* case of discrimination based on his sex. To state a *prima facie* case of sex-based discrimination, Mr. Carroll must show: "1) membership in a protected class; 2) qualification for the position; 3) an adverse employment action taken against him despite being qualified; and (4) 'the action occurred under circumstances that could give rise to an inference of intentional discrimination.'"[146] "In essence, the plaintiff must establish 'some causal nexus' between membership in the protected class and the termination decision."[147]

If Mr. Carroll establishes a *prima facie* case, the burden shifts to Guardant to produce evidence of a legitimate, nondiscriminatory reason for his termination. If Guardant does so, the burden shifts back to Mr. Carroll to provide evidence the legitimate, nondiscriminatory reason for termination is a pretext for discrimination.

Guardant challenges the fourth element of the *prima facie* test, arguing Mr. Carroll does not adduce evidence of similarly situated people outside his protected class treated more favorably or some other evidence showing a causal nexus between his gender and his termination. Guardant argues Mr. Carroll fails to show similarly situated women treated more favorably than he. Guardant points to a woman in the same department as Mr. Carroll, investigated by Mr. Collora, and subsequently terminated for unprofessional comments about doing her nails during a business call.

Mr. Carroll does not respond to the evidence regarding this woman. He instead cites evidence he asserts gives rise to an inference of discrimination based on gender: Mr. Collora's "not 1910" deposition testimony; the women with whom he worked "shunned" him; text

messages among the women showing they wanted to "avoid him like the plague"; Guardant did not interview Ms. Olsen who did not hear the "gals" comment (although she testified Mr. Carroll asked her "what the f*** is Lesli's problem?"); Guardant fabricated the statements attributed to Mr. Carroll and then conducted a faulty investigation, "which was essentially nothing more than talking to the very people who had an ax to grind against Mr. Carroll because of his age and gender and who made up these statements."[148]

At oral argument, Mr. Carroll's counsel argued there is a clear fact question regarding credibility: Mr. Carroll's denial of using the words "gal" and "chicks" versus the accounts of women who disliked him and purportedly had motive to fabricate the alleged "gal" and "chicks" comments to "get rid of" him. When asked for the evidentiary nexus between Mr. Carroll's sex, Ms. Barlow's and Ms. Kiedrowski's alleged fabricated statements, and Guardant's decision to terminate Mr. Carroll, his counsel argued the women bore discriminatory animus against him based on sex and age and Mr. Collora did not believe the women. Mr. Carroll's counsel argued this is evidenced by the comment Mr. Collora made to Mr. Carroll during the August 29, 2019 phone call where Mr. Collora remarked he thought Mr. Carroll's use of the word "gal" and "chicks" is inconsistent with his character. Mr. Carroll's counsel identifies this as the fact question precluding summary judgment on pretext.[149]

This evidence does not give rise to an inference of gender-based intentional discrimination. The "not 1910" comment post-adverse action does not evidence gender discrimination; the alleged text messages among several women and Mr. Bianco, a man, does not evidence gender-based "shunning." Mr. Carroll asserts the women fabricated the "gal" and "chicks" comments to "get rid" of him, but Mr. Bianco also reported the "f***ing chick" comment and there is no evidence the women fabricated the statements; only Mr. Carroll's

denial he made such comments.  Mr. Collora, Ms. Usilton, and Ms. Merrill received complaints about offensive language. Mr. Collora and Ms. Usilton investigated and made credibility determinations and terminated Mr. Carroll. There is no evidence creating a genuine issue of material fact to create an inference of sex-based intentional discrimination. Mr. Carroll fails to make a *prima facie* case of Title VII sex-based discrimination.

Even if Mr. Carroll met his burden of showing a *prima facie* case, there is no genuine issue of fact as to pretext. Mr. Carroll points to the same evidence to support the fourth element of the *prima facie* case. He argues there are fact issues on pretext because: he denied making the comments attributed to him; a "group of disgruntled" female employees were angry because he "upset the status quo" as evidenced by their text messages; and Guardant never allowed Mr. Carroll a chance to refute the allegations against him all create fact issues regarding pretext.

Under *Fuentes*, Mr. Carroll must point to some evidence, direct or circumstantial from which the factfinder could reasonably either (1) disbelieve Guardant's articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Guardant's action.[150]

Mr. Carroll is strident in his denial of the statements attributed to him. He argues this is a classic "he-said-they-said" situation, which "alone generates a genuine dispute of material fact" making summary judgment inappropriate. We disagree. The issue is not whether Guardant is wrong or mistaken about his use of inappropriate language; "the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."[151] In "he-said-they-said" credibility determinations, a plaintiff must "bring forth evidence that [the employer] did not have an honest belief that [the plaintiff] engaged in misconduct justifying termination."[152] Mr. Carroll must demonstrate Guardant's

explanation is dishonest due to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions from which a reasonable juror could conclude that [Guardant's] explanation is unworthy of credence, and hence infer that the employer did not act for the asserted [legitimate] reasons."[153]

The issue is not whether Mr. Carroll made the comments for which Guardant terminated him; the issue is whether Guardant *believed* he made the statements.[154] Mr. Collora testified he asked Mr. Bianco about Mr. Carroll's statement, "I've never worked for a f***ing chick before." Mr. Collora testified Mr. Bianco confirmed the statement and "pressed [Mr. Bianco] incredibly hard," threatening to fire Mr. Bianco if he lied about the statement.[155] Mr. Bianco testified he told both Ms. Barlow and Mr. Collora about the "f***ing chick" comment.[156]

Ms. Usilton testified she asked Ms. Barlow at least twice about Mr. Carroll's alleged comments asking, "Hey, you know, this is serious. Right? I need to know exactly what happened. So, you know, double-check if not triple-check that."[157] Ms. Barlow testified she confirmed to Ms. Usilton her certainty regarding reports of Mr. Carroll's inappropriate comments.[158]

Mr. Collora telephoned Mr. Carroll to ask if he ever used the word "chicks" or phrase "bunch of chicks."[159] Mr. Carroll denied using the word "chick" and told Mr. Collora he does not use the word "chicks" to refer to women.[160] After Mr. Carroll denied using the word "chick," Mr. Collora responded he did not believe it to be in Mr. Carroll's character to use the word "chick."[161] Mr. Collora did not ask Mr. Carroll if he used the words "f***" or "f***ing."[162]

Mr. Collora testified he gave Mr. Carroll "multiple chances" during their conversation where Mr. Collora asked Mr. Carroll "multiple times the same question."[163] Mr. Collora testified Mr. Carroll initially denied using the word "chick" but then "wavered at the end where he said he

could have said that."[164] Mr. Collora further testified, "I have made it clear that, you know, we conducted and asked via multiple challenges, multiple people. Everybody corroborated the same thing. And to hear from [Ms. Barlow], to hear from [Mr. Bianco], to hear from Pam Ranallo, to hear from [Ms. Usilton], to hear from the people team, and then to hear Mr. Carroll's wavering in his own answer, solidified for me my position that we were making the appropriate decision."[165]

Mr. Collora made a credibility decision based on the information before him. Mr. Carroll challenges the decision claiming it was based on a faulty or sham investigation. But there is no evidence Mr. Collora decided to fire him  based on gender bias. The evidence shows Mr. Collora terminated a younger woman without investigation after she commented on "doing her nails" during a business call. Guardant's investigation of alleged misconduct by the three younger men – which Mr. Carroll points to as legitimate investigations – does not support his gender-bias claim as all three are men.

Mr. Carroll's assertion the group text messaging among mainly women, although Mr. Bianco is among the messaging, arguably evidences discontent with Mr. Carroll.  We do not see how it shows gender-bias among non-decision makers. It is undisputed Mr. Collora made the decision to terminate Mr. Carroll and is not on the text messaging.

Mr. Carroll fails to meet his burden of showing pretext in his gender-based discrimination claim. We enter summary judgment in favor of Guardant.

> ## 2.    We grant summary judgment dismissing the hostile work environment claim based on sex.

We similarly find Mr. Carroll fails to establish a genuine issue of material fact of a gender-based hostile work environment claim. To establish a *prima facie* case of hostile work environment under Title VII, Mr. Carroll must show: "(1) intentional discrimination based on

sex; (2) severe or pervasive conduct; (3) a detrimental effect on the plaintiff; (4) a detrimental effect on a reasonable person in similar circumstances; and (5) the existence of *respondeat superior* liability."[166]

Our Court of Appeals recently instructed we must  analyze the alleged harassment by looking at all the circumstances. These circumstances include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. We must also find; "discriminatory 'conduct must be extreme [enough] to amount to a change in the terms and conditions of employment'"; and "[u]nless extremely serious, offhand comments and isolated incidents are insufficient to sustain a hostile work environment claim."[167]

Mr. Carroll describes a "coven of colleagues" and "cooperative clique" comprised of Ms. Kiedrowski, Ms. Barlow, and Ms. Olsen. He points to their late August 2019 text messages as evidence of their dislike of him because he is a man. He argues there are genuine issues of material fact as to how these women treated him and their motivation in doing so precluding summary judgment. He ascribes liability to Guardant because it knew or should have known of the "harassment."

The text messages Mr. Carroll points to are comments referring to him as "the male Karen"; calling him "exhausting"; expressing a desire to "avoid [Mr. Carroll] like the plague"; calling him "the worst"; and commenting it is "nice to see" Ms. Barlow and Ms. Kiedrowski bonding over something,  Mr. Carroll infers  is a shared "hatred" of him.

Mr. Carroll also points to a comment he made during a business call with Ms. Kiedrowski and Ms. Olsen, which Ms. Kiedrowski did not like. Ms. Kiedrowski took issue

with Mr. Carroll using the word "we" when referring to his previous experience at Veracyte. By Mr. Carroll's testimony, Ms. Kiedrowski called him and said "are you open for some constructive" feedback and told him use of the word "we" when referring to Veracyte is offensive because "we" is Guardant.[168]

Like his age-based hostile work environment claim fails, Mr. Carroll fails to adduce evidence of a *prima facie* case of a hostile work environment. He fails to adduce evidence of a workplace "permeated with discriminatory intimidation, ridicule, and insult . . . that [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment."[169] The text messaging does not evidence gender-based intimidation, ridicule, or insult. There is no evidence Mr. Carroll knew of the text messaging. "The Supreme Court has been clear that a plaintiff must point to 'extreme' conduct to support an actionable hostile work environment claim; 'offhand comments,' 'isolated incidents,' and 'mere utterance[s] of an ethnic or racial epithet which engenders offensive feelings in an employee' do not suffice."[170]

Mr. Carroll fails to adduce evidence comments like "the male Karen," "he's the worst" and "exhausting" are so severe or pervasive to alter his work environment. We are reminded by our Court of Appeals "[t]he Supreme Court has made clear that Title VII is not 'a general civility code' and that 'the ordinary tribulations of the workplace' are not grounds for a hostile work environment claim.[171]

To the extent Mr. Carroll argues an all-woman "clique" of text messaging of which he is not a part because he is a man supports a hostile work environment, his argument is not supported by the evidence. Mr. Bianco, a man, participated in the text messaging. Mr. Carroll fails to state *prima facie* case of hostile work environment.

### 3.    We grant summary judgment dismissing the retaliation claim.

Mr. Carroll claims Guardant retaliated against him "because of his complaints about discrimination and harassment as to the Company's failure to conduct a full and fair investigation of false and defamatory claims made against him" regarding inappropriate comments about women.[172] Guardant moves for judgment. Mr. Carroll did not brief this issue.

To proceed with a prima facie case of Title VII retaliation, Mr. Carroll must show: (1) [he] engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action."[173]

Like his ADEA retaliation claim, Mr. Carroll adduced no evidence of his protected activity. He alleged he complained about discrimination and harassment as to Guardant's failure to conduct a full and fair investigation of false and defamatory claims made against him.  But he paints a picture of being unaware of Guardant's investigation.  He claims Guardant did not give him a a chance to respond to allegations.  He also claims Guardant fired him without telling him who made claims against him. We cannot find protected activity. There is no genuine issue of material fact on a retaliation claim based on Mr. Carroll's protected activity in complaining about discrimination on the basis of his sex.

### 4.    We grant summary judgment on the disparate impact claim.

Mr. Carroll alleged Guardant's "facially neutral practices, policies, and/or customs had a disparate impact upon male employees at Guardant in violation of Title VII."[174]  He alleged, for example, Guardant "did not follow its own practices, policies and/or customs in handling the complaints lodged against Mr. Carroll and did not investigate the complaints in the same manner

as it handles complaints by and against female employees."[175]   Following discovery, Guardant moved for judgment.  Neither party briefed a disparate impact theory of discrimination.

"[T]o establish a prima facie case of disparate impact in a Title VII case, a plaintiff must (1) identify a specific employment policy or practice of the employer and (2) proffer evidence, typically statistical evidence, (3) of a kind and degree sufficient to show that the practice in question has caused exclusion of applicants for jobs or promotions (4) because of their membership in a protected group."[176]

Mr. Carroll provides us with no evidence to support a disparate impact theory of discrimination. He does not identify a facially neutral company policy or practice affecting men differently from women. Even if we assume the policy is "investigating complaints", the only evidence regarding an investigation of a female employee shows Guardant afforded her even less opportunity to defend herself when Mr. Collora fired her for talking about her nails on a sales call.

Mr. Carroll also adduces no statistical evidence. Mr. Carroll's disparate impact theory of discrimination fails.

### C.    We enter judgment for Guardant on the breach of contract claims.

Mr. Carroll alleges Guardant breached an oral contract regarding the terms of his employment and breached its duty of good faith and fair dealing implied in every contract under Pennsylvania law. He contends he is not an at-will employee. Guardant seeks summary judgment on the breach of contract claim arguing it fails as a matter of law because Mr. Carroll had an at-will employment relationship with Guardant.

Mr. Carroll responds to summary judgment with two separate arguments: (1) he had a verbal employment contract; and, presumably alternatively, (2) he can rebut the presumption of

at-will employment under Pennsylvania law. He argues even if he had an at-will relationship with Guardant, the implied duty of good faith and fair dealing remains Guardant's obligation.

### *There is no genuine issue of material fact on a verbal employment contract.*

Under Pennsylvania law, "parties may bind themselves [to employment] contractually prior to the execution of the written document through mutual manifestations of assent."[177] "Thus evidence of mutual assent to employ and be employed which contains all the elements of a contract may be construed as a binding contract of employment through [sic] not reduced to writing."[178]

Mr. Carroll asserts he had a verbal contract of employment after discussions with Mr. Collora and Ms. Usilton.[179] To proceed to trial on a breach of contract claim under Pennsylvania law, Mr. Carroll must adduce evidence showing "1) the existence of a contract, including its essential terms; 2) a breach of a duty imposed by the contract; and 3) resultant damage."[180]

In response to questions regarding an implied or verbal employment contract, Mr. Carroll swore:

- In discussions with Mr. Collora and Ms. Usilton, "all along the way, we planned, we had time to plan and we talked about long-term growth, what we see in the future, how this company is going to outperform for years to come. And you're [Mr. Carroll] going to be a cornerstone of it. Your experience is going to help us get to where we have to get, and we're going to do this over time. And it's a great career move, et cetera, et cetera. . . . [W]e had a lot of time to communicate. And the communication was always positive about if you join, things are going to go well for all of us. We want you. We expect this to go well long term. Both of us expected it to go well long term. It was verbally said. But even without verbally saying it, why in God's name would [Ms. Usilton] or [Mr. Collora] waste their time on me if they didn't want me to stay long term. These are smart salespeople. They want to bring people on that are going to help their terms. So that said, it was implied and also verbal, to me this was the last place I was going to be."[181]

- "[D]uring that time together [he, Mr. Collora, and Ms. Usilton], there was a lot of talk about me being there and helping the team over the long haul, over the time that this company is going to exist. Building the team. Same sort of aspirations [Mr. Collora] has

for himself, he had for me, which is to stay here long term and do well and see this
company through. Same, you know, feelings [Ms. Usilton] had for herself. And we
shared that. You know, this is what is expected of me. To be part of this team as we grow
going forward and make this, you   \know, another great company like Veracyte.
Veracyte, I've been in eight-and-a-half years. If there's implications, it's going to last a
long time."[182]

This is the entirety of the evidence Mr. Carroll believes formed a verbal contract of
employment with Guardant. While admitting he believed he had a verbal contract with Guardant
as "the last place he was going to be" employed in his career, he objects to Guardant's reliance
on his deposition testimony as the basis for his claim.[183] He argues his response to deposition
questions called for legal conclusions to which his counsel objected and are "inadmissible in
support of a motion for summary judgment as they do not represent undisputed facts."[184] But if
we cannot rely on Mr. Carroll's testimony regarding the terms of the alleged verbal employment
contract, where is the evidence to establish such a contract and the agreed upon terms?

Mr. Carroll does not provide us with evidence of the parties' mutual assent to employ
him or the terms of the employment outside of the at-will terms twice agreed by him. Mr.
Carroll's argument is distinguishable from the arguments in *George W. Kistler, Inc.*, which he
argues is applicable. In *George W. Kistler, Inc*, an employer sought to enforce a non-compete
agreement against its former employee. The former employee contended the parties' verbal
agreement reached two weeks before a written agreement did not include this non-compete
provision and the written agreement was not supported by adequate consideration. The
Pennsylvania Supreme Court agreed with the employee, finding  evidence of  "not only [of an
oral agreement] [where employee] would cease working for his present employer and begin
working for [new employer], but all aspects of the employment relationship such as wages,

duties and benefits were also agreed upon" . . . "without any promise not to engage in a competitive enterprise."[185]

Mr. Carroll adduces no evidence of terms defining the terms of an employment relationship beyond the at-will agreement. We have only Mr. Carroll's testimony he understood he entered a verbal employment contract for long-term employment based on his discussions with Mr. Collora and Ms. Usilton "this was the last place [he] was going to be." Unlike the employee in *George W. Kistler, Inc.*, Mr. Carroll does not adduce evidence of "mutual assent to employ and be employed which contains all the elements of a contract" which "may be construed as a binding contract of employment."

We enter judgment in favor of Guardant on breach of a verbal employment contract.[186]

### *There is no genuine issue of material fact to rebut the presumption of at-will employment.*

Under Pennsylvania law, "employment is presumed to be at-will unless it is shown that the parties contracted to restrict the right to terminate employment."[187] "An at-will employment relationship may be terminated by either the employer or the employee at any time, for any reason, or for no reason."[188] "Where the plaintiff has acknowledged that the employment is at-will, the presumption of at-will employment controls."[189]

Guardant's offer letter to Mr. Carroll and its Employee Handbook–both of which he signed–state employment is at-will.  Mr. Carroll conceded his at-will status:

> Q. Did you believe you were an at-will employee at Guardant?
>
> A. Yes. . . . It's an at-will company.
>
> Q. Did you believe you were an at-will employee?
>
> A. Yes.[190]

Mr. Carroll may rebut the presumption of at-will employment by establishing one of the following: "(1) an agreement for a definite duration; (2) an agreement specifying that the employee will be discharged for just cause only; (3) sufficient additional consideration; or (4) an applicable recognized public policy exception."[191] Mr. Carroll contends there is additional consideration to rebut the at-will presumption.

"An employee attempting to overcome the presumption of at-will employment must show clear and precise evidence of an implied-in-fact contract, which may be established by an agreement for employment for a definite duration or by the employee providing 'additional consideration.'"[192] "The term 'additional consideration' refers to an employee affording an employer a substantial benefit, or undergoing a substantial hardship, other than the services which the employee was hired to perform."[193] If Mr. Carroll "is able to prove that [he] provided additional consideration, the court may infer that the parties intended to overcome the at-will presumption."[194]

The question of whether there is sufficient additional consideration is a question of fact generally left for the jury, but "[c]ourts generally require a showing of some 'extraordinary benefit' or 'extraordinary detriment' before allowing the question to reach the jury."[195]   We require this showing because the burden of proof to overcome the presumption of at-will employment is "very great."[196] "The court itself may answer questions of fact regarding the at-will presumption when 'the resolution of the issue is so clear that reasonable minds would not differ on its outcome.'"[197]

Mr. Carroll contends there is sufficient additional consideration to rebut the presumption of at-will employment. He cites substantial hardship when (a) he left his position at Veracyte

foregoing hundreds of thousands of dollars in restricted stock options; and, (b) joined Guardant to again work with Dr. Lanman after being heavily recruited.

We cannot find authority, and Mr. Carroll provides us with none, where leaving a position with restricted stock options and taking a position with a mentor after recruitment is sufficient to rebut the presumption of at-will employment. In *Cashdollar v. Mercy Hospital of Pittsburgh*, the Pennsylvania Superior Court found plaintiff who resigned from his job in Virginia, sold his house, and moved his pregnant wife and two-year-old child to Pittsburgh only to be terminated sixteen days after starting with his new employer rebutted the at-will presumption.[198] In *News Printing Co., Inc. v. Roundy*, the Pennsylvania Superior Court found plaintiff rebutted the at-will presumption on termination after three-months by showing he left employment in Massachusetts, turned down another offer of employment, sold his family's home and bought a new home in Pennsylvania.[199] By contrast, in *Woods* the court granted summary judgment to the employer when it retracted a job offer to a pilot intending to move from England to Philadelphia, finding no genuine issue of material fact of additional consideration to overcome the at-will presumption.[200] The court rejected plaintiff's argument taking a course to obtain flight certification and turning down another job offer sufficient additional consideration to rebut the at-will presumption.[201] Mr. Carroll does not offer evidence of a long distance move, sale of his home, or similar circumstances considered by Pennsylvania courts to be sufficient additional consideration.

Mr. Carroll knew of his at-will employment before he left Veracyte where he had $350,000 to $400,000 in stock options. He began employment after signing the June 3, 2019 acknowledgment of the Employee Handbook and the June 26, 2019 offer letter both stating his employment was at-will. With both the Employee Handbook and offer letter in hand clearly

stating his employment was at-will, Mr. Carroll left Veracyte and his stock options to take a position at Guardant. In *Parment v. Crown Cork & Seal Co., Inc.*, employer terminated plaintiff employee after nine months of employment where plaintiff terminated his business, sold his home, his wife quit her job, and relocated to South Africa believing he would be working for at least two years.[202] The court found plaintiff's signing of two documents "prominently stated that he was an at-will employee and that his assignment letter did not constitute a contract of employment. Even if the court were to find additional consideration, the disclaimers require the court to interpret this as an at-will contract."[203]

There is no genuine issue of fact regarding additional consideration in Mr. Carroll's acceptance of at-will employment. We similarly see no genuine issue of fact regarding additional consideration by accepting the position at Guardant to have the opportunity to work again with his mentor Dr. Lanman. We enter summary judgment in Guardant's favor on the breach of contract claim.

### *Duty of good faith and fair dealing does not apply.*

Under Pennsylvania law, "the covenant of good faith and fair dealing [, when applicable,] acts as a term of the contract, and that covenant arises from the contract itself."[204] "A breach of the implied duty of good faith is, therefore, a breach of the contract between the parties."[205] "Pennsylvania law does not recognize a separate claim for breach of implied covenant of good faith and fair dealing."[206] Having dismissed the breach of contract claim, we dismiss Mr. Carroll's breach of the duty of good faith and fair dealing claim.

### D.      We enter judgment for Guardant on the fraudulent inducement claim.

Mr. Carroll alleges Guardant fraudulently induced him to enter into an employment contract based on the same facts supporting his breach of contract claim, including

misrepresentations made by Guardant to Mr. Carroll regarding its plans for expansion, its desire to have Mr. Carroll implement his management techniques to improve underperforming sales, and its general interest in having Mr. Carroll as a long-term member of the company. He alleged Guardant made these and other representations knowing he "was on the fence" about taking a job at Guardant and wanted him to accept the job offer.

The elements of a claim for intentional misrepresentation under Pennsylvania law are: "(1) [a] representation; (2) which is material . . . ; (3) made falsely, with knowledge of its falsity . . . ; (4) with the intent of misleading another . . . ; (5) justifiable reliance on the misrepresentation; and[ ] (6) the resulting injury was proximately caused by the reliance."[207]

Mr. Carroll argues "many disputes of material fact . . . relating to what was promised to [him] to leave his secure position and join Guardant" precludes summary judgment. Guardant argues Mr. Carroll cannot establish the third, fourth, and fifth elements of a claim for fraudulent inducement. On the third element, Guardant points to Mr. Carroll's deposition testimony:

> Q.   Do you believe that there were any misrepresentations made to you during the hiring process?
>
> A.   No.[208]

Mr. Carroll disputes this, also pointing to his deposition testimony:

> Q.   When the company was trying to get you to join, so when they're recruiting you, at that time do you think, do you believe that any misrepresentations were made to you?
>
> A.   Yes. We were going to have a long-term relationship. That's what I was after . . . .[209]

Guardant argues Mr. Carroll's testimony only highlights he cannot meet the fourth element of fraudulent inducement–intent to mislead him–because he testified:

> Q.   Now, at the time that they talked about the long-term relationship, do you believe They were misrepresenting it when they discussed it?

A.      I doubt it was deliberate. I don't think they brought me in to let me go in 37 days. I believe they had the same intention as me, to have a good working relationship. Why else go through the trouble. But I felt very secure going in that if I just did what I do, follow directions, do my job to the highest, that I would still be with the company today.[210]

Guardant argues even if there is a misrepresentation, Mr. Carroll cannot show the fifth element–justifiable reliance on the misrepresentation–because the offer letter had an integration clause.

Mr. Carroll provides no response to Guardant's arguments except to say "there are many disputes of material fact . . . relating to what was promised to [him] to induce him to leave his secure position and join Guardant."

### E.      We enter judgment for Guardant on the tortious interference claim.

Mr. Carroll alleges he had a valid, binding, and enforceable contract of employment with Guardant in spring 2019. He alleges "several employees of Guardant" knew of his contract and "intentionally and improperly lied to Guardant management claiming Mr. Carroll made inappropriate statements referring to female colleagues" ultimately leading to his termination.[211] He alleges Guardant tortiously interfered with the parties' employment contract. Mr. Carroll does not sue his co-workers.

Under Pennsylvania law, "a party is liable for pecuniary loss due to tortious interference with a contractual relationship when the party 'intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract . . . .'"[212] The elements of the claim are: "(1) [T]he existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that

contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct."[213]

Mr. Carroll had an at-will employment relationship with Guardant. As a matter of Pennsylvania law, "an action for intentional interference with performance of a contract in the employment context applies only to interference with a prospective employment relationship whether at-will or not, not a presently existing at-will employment relationship."[214]

Even if Mr. Carroll had an employment contract with Guardant, under Pennsylvania law, Guardant cannot tortiously interfere with a contract to which it is a party.[215] "A corporate entity and its agents are not distinct parties for purposes of contracting . . . [t]hus a corporation's agents or employees generally cannot, as a matter of law, tortuously interfere with the corporation's own contracts."[216] An agent can qualify as a third party if her acts fall outside the scope of employment.[217]

There are no allegations, evidence of, or even an argument in Mr. Carroll's opposition to summary judgment his colleagues who he claims fabricated statements acted outside the scope of their employment. We dismiss the intentional interference with contract claim.

### F.     We enter judgment for Guardant on the defamation claim.

Mr. Carroll claims Guardant, through its employees and agents, published his alleged comments to third parties inside and outside of the company. He claims several employees from his former position at Veracyte contacted him after his termination from Guardant "expressing their condolences and disbelief [he] would make inappropriate comments." Mr. Carroll claims Guardant damaged his reputation and personal and professional standing within the community.

Guardant seeks summary judgment on Mr. Carroll's defamation claim. Guardant argues the defamation claim fails as a matter of law because (a) there is no evidence Guardant published

45

any statements outside the company; and (b) statements inside the company were made during the investigation into Mr. Carroll's conduct and are privileged.  Mr. Carroll does not respond to Guardant's argument there is no evidence statements were published outside of the company. He instead focuses on statements made inside the company, arguing Guardant abused its conditional privilege.

Under Pennsylvania law, Mr. Carroll has the burden of proving the elements of a defamation claim: "(1) The defamatory character of the communication. (2) Its publication by the defendant. (3) Its application to the plaintiff. (4) The understanding by the recipient of its defamatory meaning. (5) The understanding by the recipient of it as intended to be applied to the plaintiff. (6) Special harm resulting to the plaintiff from its publication. (7) Abuse of a conditionally privileged occasion."[218]

If Mr. Carroll meets his burden, Guardant has the burden of proving: "(1) The truth of the defamatory communication. (2) The privileged character of the occasion on which it was published. (3) The character of the subject matter of defamatory comment as of public concern."[219]

### *There is no evidence of publication outside of Guardant.*

Mr. Carroll believes two former colleagues from Veracyte, Matt Lemiuex and Shane Nelson, heard "through the grapevine" Guardant terminated Mr. Carroll for making derogatory comments.[220] He also believes David James heard about the reason for his termination from Guardant.[221]

Mr. Lemieux testified: he did not know until three weeks before his October 29, 2020 deposition when an attorney called to ask him if he knew Guardant no longer employed Mr. Carroll; the call from the attorney is the first time he became aware Guardant no longer

employed Mr. Carroll, he does not know the circumstances under which Guardant terminated Mr. Carroll; and he did not know of an alleged wrongful termination until Mr. Carroll told him Guardant terminated him.[222]

Mr. Nelson testified: he became aware at a meeting with Veracyte colleagues Guardant no longer employed Mr. Carroll but did not know any detail; he knows "there was a complaint" against Mr. Carroll but does not know details; he does not recall Mr. Lemieux asking him if he heard Guardant fired Mr. Carroll for making derogatory comments; he does not recall speaking to anyone about the reason Guardant terminated Mr. Carroll's employment; and did not have any communications with current or former Guardant employees about the reason for Mr. Carroll's separation from Guardant.[223]

Mr. James, a former colleague of Mr. Carroll, testified he did not know Guardant no longer employed Mr. Carroll until Mr. Carroll called him and further testified he did not know the reason for the separation until Mr. Carroll told him.[224]

Mr. Carroll fails to meet his burden of producing evidence of publication of an alleged defamatory statement by Guardant to a third person.[225] There is no evidence of publication. The three individuals Mr. Carroll believes to have heard the alleged defamatory reason for his termination from Guardant did not know the basis of termination.

### *There is no evidence Guardant abused a conditional privilege.*

It is Guardant's burden to show its communications are privileged. Mr. Carroll concedes there is a conditional privilege for workplace investigations, but argues Guardant abused the privilege. Once Guardant shows its communications are privileged, it is Mr. Carroll's burden to show it abused the privilege.[226]

Pennsylvania recognizes a conditional privilege "when the speaker and recipient share a common interest in the subject matter and both are entitled to know the information," including "when an employer's workers communicate with each other in connection with the discipline, including termination, of a fellow employee."[227] Guardant argues its internal communications regarding Mr. Carroll's complained-of comments are conditionally privileged.

Mr. Carroll argues Guardant abused its conditional privilege. "Abuse of a conditional privilege is indicated when the publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given, or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or included defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose."[228]

Mr. Carroll argues Guardant abused its privilege by publishing statements to Ms. Usilton and Becky Nagy; Guardant's investigation "was replete with negligence and malice"; and material factual disputes regarding what Mr. Carroll said and what "Guardant representatives" shared with others outside the company preclude summary judgment.

We already addressed comments made outside the company; there is no evidence to support Mr. Carroll's assertion. With regard to comments made inside the company, Mr. Carroll now argues Ms. Usilton testified she did not "recall anything like" an investigation and the conditional privilege does not apply to her.[229] Reading Ms. Usilton's deposition testimony in context, she testified she did not recall the word "investigation" being used, but confirmed "we definitely reached out to the people [reporting Mr. Carroll's alleged comments] twice, if not more, to say, you know, "Tell me again, you know, what actually happened. Tell me again what was actually said.' . . ."[230] There is no dispute Ms. Usilton, as National Sales Director, managed Mr. Carroll and knew about the comments he allegedly made causing his termination.

Notwithstanding Mr. Carroll's denial he made the comments at issue, Ms. Usilton knew about the alleged comments from Ms. Barlow's reporting to her and from her presence on a call during which Mr. Collora reported the alleged comments to Vice President of Human Resources Ms. Merrill. The record shows Ms. Usilton's involvement in the reporting of Mr. Carroll's comments. We see no evidence creating a fact issue on an abuse of the conditional privilege as to her.

Mr. Carroll next argues Guardant abused its conditional privilege–not in the investigation of his reported comments—but in text messages between Ms. Usilton and another member of the sales team in which Ms. Usilton texted, "S***. I talked to Becky."[231] Mr. Carroll argues this text message evidences the comments falsely attributed to him were published to Becky Nagy, Senior Director of Medical Affairs at the time, who worked with Mr. Carroll's sales team. This text message does not evidence Ms. Usilton conveyed Mr. Carroll's alleged comments to Ms. Nagy. When asked about the text at her deposition, Ms. Nagy did not remember talking to Ms. Usilton about Mr. Carroll; did not express surprise at her name coming up because she worked in the area of pulmonology where Ms. Usilton had concerns about Mr. Carroll's performance and Ms. Nagy offered him training but he turned her down her offer.[232] Even if Ms. Usilton communicated Mr. Carroll's alleged comments to Ms. Nagy–and there is no evidence she did so–Mr. Carroll does not provide us with any evidence why it is unreasonable for Ms. Nagy, a Senior Director of Medical Affairs, to know about Mr. Carroll's alleged comments.

At summary judgment, Mr. Carroll must demonstrate facts in the record to enable him to make a sufficient showing of the essential elements of defamation. He failed to do so. We enter judgment in Guardant's favor on defamation.

## III.    Conclusion

Bill Carroll alleges his former employer, Guardant Health, Inc., fired him because of his age and sex rather than as a disciplinary measure. After oral argument, and considering the parties' extensive briefing, we grant in part and deny in part Guardant's motion for summary judgment. We deny summary judgment on the age-based disparate treatment claim only, finding inconsistencies with Guardant's policies and in its treatment of three younger males who were disciplined after a more fulsome investigation of physical or verbal harassment of female co-workers but not fired.  Given the considerable deference to Mr. Carroll's disputed facts at this stage, we must deny judgment as a matter of law on this one claim.

There are no genuine issues of material fact on his remaining claims and judgment is warranted as a matter of law. We grant summary judgment in favor of Guardant on Mr. Carroll's:  hostile work environment, retaliation, and disparate impact claims on the basis of his age under ADEA; disparate treatment, disparate impact, hostile work environment, and retaliation claims on the basis of sex under Title VII; and, state law claims of breach of contract, fraudulent inducement, defamation, and intentional interference with contractual relations.

---

[1] Our Policies require a Statement of Undisputed Material Facts ("SUMF") and an appendix in support of summary judgment. Guardant filed its Motion for summary judgment and supporting memorandum of law at ECF Doc. No. 19-1, its SUMF at ECF Doc. No. 19-4, and appendix at ECF Doc. No. 19-2. References to the appendix are by Bates number, for example, "1a."

Mr. Carroll responded to Guardant's Motion at ECF Doc. No. 21, responded to Guardant's SUMF, and provided his own Statement of Undisputed Material Facts ("Carroll SUMF") at ECF Doc. No. 21-1. Mr. Carroll's response to Guardant's Motion for summary judgment contained a Rule 56(d) affidavit by his counsel and moved to compel discovery. ECF Doc. No. 21.

Guardant filed a Reply brief and response to Carroll's SUMF at ECF Doc. Nos. 22, 23. Mr. Carroll then moved for leave to file a sur-reply (ECF Doc. No. 24) and filed another Rule 56(d) motion (ECF Doc. No. 25). We ordered Guardant to provide comparator information sought by Mr. Carroll and allowed the parties to file supplemental briefing. ECF Doc. No. 28. Mr. Carroll submitted his sur-reply (ECF Doc. No. 30) and Guardant filed a supplemental brief

(ECF Doc. No. 31).We held oral argument on the motion for summary judgment on December 21, 2020.

We refer to ECF Doc. No. 23 when citing the parties' statement of undisputed material facts. Guardant filed ECF Doc. No. 23 in response to Mr. Carroll's response to its statement of undisputed material facts and to Mr. Carroll's statement of additional facts. Mr. Carroll's statement of additional facts began numbering at paragraph 1 instead of continuing with consecutive numbering from Guardant's statement of undisputed material facts. To minimize confusion with now two sets of numbered paragraphs, we refer to ECF Doc. No. 23 which is broken down by section and paragraph number.

[2] ECF Doc. No. 23 § Q, ¶ 1.

[3] ECF Doc. No. 1 ¶ 23.

[4] ECF Doc. No. 23 § Q, ¶ 3.

[5] *Id.* § A, ¶ 1.

[6] *Id.* § Q, ¶¶ 4, 5, 7.

[7] *Id.* § B, ¶ 13; § Q, ¶¶ 6, 9.

[8] *Id.* § Q , ¶ 10.

[9] *Id.*

[10] *Id.*

[11] *Id.* § Q, ¶¶ 11–12.

[12] *Id.* § Q, ¶ 13.

[13] ECF Doc. No. 19-2 at 569a.

[14] *Id.* at 570a.

[15] *Id.* at 538a.

[16] *Id.* at 529a–532a.

[17] *Id.* at 531a.

[18] *Id.* at 532a.

[19] ECF Doc. No. 23 § B,  ¶¶ 12–13.

[20] *Id.* § J,  ¶ 74.

[21] *Id.* § D, ¶¶ 20–24. The sales team is comprised of eight positions, but three remained vacant at the time of Mr. Carroll's hiring. Guardant planned for Mr. Carroll to begin managing the sales team in the fall.

[22] *Id.* § D, ¶ 24.

[23] *Id.* § Q, ¶ 16.

[24] *Id.* § D, ¶¶ 26–28.

[25] ECF Doc. No. 19-2 at 92a–93a.

[26] ECF Doc. No. 19-2 at 92a–93a; ECF Doc. No. 23 § Q,  ¶ 26.

[27] ECF Doc. No. 19-2 at 93a; ECF Doc. No. 23 § Q,  ¶¶ 23–25.

[28] ECF Doc. No. 23 § D, ¶ 29. Mr. Carroll denies making this and any of the statements complained of and contends Ms. Olsen, Mr. Bianco, Ms. Barlow, and Ms. Kiedrowski fabricated the alleged statements. *Id.* § D, ¶¶ 29–36.

[29] *Id.* § D, ¶¶ 29–30.

[30] *Id.* § D, ¶ 31.

[31] *Id.* § D,  ¶¶ 31, 32, 35.

[32] *Id.* § D,  ¶¶ 33, 36.

[33] *Id.* § D,  ¶¶ 33–35.

[34] *Id.* § D, ¶ 38.

[35] *Id.* § D, ¶ 36.

[36] *Id.* § D, ¶ 40.

[37] ECF Doc. No. 19-2 at 34a-35a, pp. 132-133.

[38] ECF Doc. No. 21-2 at 686a. Mr. Carroll interprets the term "Karen" as a pejorative slang term. According to Dictionary.com, the term "Karen" is "a pejorative slang term for an obnoxious, angry, entitled, and often racist middle-aged white woman who uses her privilege to get her way

or police other people's behaviors. As featured in memes, Karen is generally stereotyped as having a blonde bob haircut, asking to speak to retail and restaurant managers to voice complaints or make demands, and being an anti-vaxx, Generation X soccer mom. In 2020, Karen spread as a label used to call out white women who were captured in viral videos engaging in what are widely seen as racist acts."  https://www.dictionary.com/e/slang/karen/

Urban Dictionary defines the term "Karen" as a "[m]iddle aged woman, typically blonde, makes solutions to others' problems an inconvenience to her although she isn't even remotely affected." https://www.urbandictionary.com/define.php?term=Karen.

Guardant offers uncontradicted testimony the "Karen" refers to an employee Karen Burns known to talk too much among Guardant supervisors. ECF Doc. No. 19-2 at 362a–363a (deposition testimony of Lesli Kiedrowski at p. 122); ECF Doc. No. 19-2 at 479a–480a (deposition testimony of Becky Nagy at pp. 102–103).

[39] ECF Doc. No. 21-2 at 687a; ECF Doc. No. 23 § Q, ¶ 30.

[40] *Id.* at 674a.

[41] *Id.* at 680a.

[42] ECF Doc. No. 23 § G, ¶ 42; ECF Doc. No. 19-2 at 100a, p. 110. Mr. Carroll does not deny Steven Collora, Danielle Usilton, and Guardant's human resources managed the investigation but denies the *bona fides* of the investigation, calling it a "sham."

[43] ECF Doc. No. 23 § G,  ¶ 44; ECF Doc. No. 19-2 at 110a, p. 152.

[44] ECF Doc. No. 21-2 at 641a -651a.

[45] *Id.* at 646a.

[46] *Id.* at 647a.

[47] *Id.* at 648a.

[48] *Id.* at 649a.

[49] ECF Doc. No. 21-2 at 662a-664a; ECF Doc. No. 30 at 850a, ¶ 5.

[50] ECF Doc. No. 21-2 at 662a.

[51] *Id.*

[52] *Id.* at 662a-664a.

[53] *Id.* at 663a.

[54] *Id.* at 652a.

[55] ECF Doc. No. 21-2 at 652a-657a.

[56] *Id.* at 658a–661a.

[57] ECF Doc. No. 30 at 850a, ¶ 6.

[58] ECF Doc. No. 21-2 at 658a–661a.

[59] ECF Doc. No. 19-2 at 600a–601a.

[60] *Id.* at 601a, ¶¶ 6–8.

[61] *Id.* at 601a, ¶¶ 6–8. Mr. Carroll concedes Mr. Collora swore to these facts but denies their accuracy because he lacks information to determine the truth. Mr. Carroll apparently did not timely pursue discovery on this issue and did not move to compel discovery regarding the female comparator in two motions to compel discovery after Guardant moved for summary judgment. *See* ECF Doc. Nos. 21, 25.

[62] *Id.* at 154a, p. 85.

[63] *Id.* at 205a, p. 97.

[64] ECF Doc. No. 23 § G, ¶ 46; ECF Doc. No. 19-2 at 275a, pp. 78–79.

[65] ECF Doc. No. 23 § G, ¶¶ 47–50; ECF Doc. No. 19-2 at 108a, pp. 142–144.

[66] ECF Doc. No. 19-2 at 232a, pp. 8–9.

[67] ECF Doc. No. 23 § G, ¶¶ 53–54.

[68] *Id.* § G, ¶¶ 53–54; ECF Doc. No. 19-2 at 101a-102a, pp. 117–119.

[69] ECF Doc. No. 23 § G, ¶ 53.

[70] ECF Doc. No. 19-2 at 102a, p. 121.

[71] *Id.* at 102a-103a, pp. 121-123.

[72] *Id.* at 108a.

[73] *Id.*

---

[74] ECF Doc. No. 19-1 at 109a, p. 146.

[75] ECF Doc. No. 23 § Q, ¶ 42. Mr. Collora testified he did not keep notes of the investigation. ECF Doc. No. 19-2 at 113a, p. 162.

[76] ECF Doc. No. 23 § Q, ¶ 42.

[77] ECF Doc. No. 21-2 at 669a.

[78] ECF Doc. No. 23, § L, ¶¶ 88, 90.

[79] *Id.* ¶ 91.

[80] ECF Doc. No. 23 § H, ¶¶ 59, 64.

[81] *Id.* § H, ¶ 60.

[82] ECF Doc. No. 23 § J, ¶ 75; ECF Doc. No. 30-1 at 850a, ¶ 7.

[83] ECF Doc. No. 1 ¶¶ 60, 72(h), 82.

[84] ECF Doc. No. 21-2 at 639a.

[85] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.,* 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson*, 850 F.3d at 533-34 (3d Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pitt.*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-323).

[86] We analyze the ADEA and PHRA claims together as both statutes use the same legal standard. *Gress v. Temple Univ. Health Sys.*, 784 F. App'x 100, 104 (3d Cir. 2019) (citing *Glanzman v. Metropolitan Mgmt. Corp.*, 391 F.3d 506, 509 n.2 (3d Cir. 2004)).

---

[87] ECF Doc. No. 1 ¶¶ 79–86.

[88] 29 U.S.C. § 623(a)(1).

[89] *Willis*, 808 F.3d at 644 (citing *Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167, 177–78 (2009)).

[90] *Id.* (citing *McDonnell Douglas*, 411 U.S. 792 (1973)). Mr. Carroll's briefing applies the *McDonnell Douglas* burden-shifting analysis to his age claim.

[91] *Id.* (quoting *Pivirotto v. Innovative Sys., Inc*., 191 F.3d 344, 357 (3d Cir. 1999)).

[92] *Id.* (quoting *Burton v. Teleflex, Inc.*, 707 F.3d 417, 426 (3d Cir. 2013)). Our Court of Appeals recently explained the fourth factor is sometimes phrased as the "adverse action occurred under circumstances that create an inference that plaintiff's age was a motivating factor" and sometimes phrased as to require plaintiff to show the plaintiff "was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive." *Dodson v. Coatesville Hosp. Corp.*, 773 F. App'x 78, 80, n. 3 (3d Cir. 2019) (citing *Willis*, 808 F.3d at 644). The court explained: "[t]he *Willis* formulation can be traced back to a case in which we held that 'an ADEA plaintiff may establish the fourth element of the *McDonnell Douglas* test for a prima facie case by showing that s/he was replaced by a person sufficiently younger to permit an inference of age discrimination,'" citing *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 793 (3d Cir. 1985). Replacement by another employee sufficiently younger "is just one way to establish the fourth element." *Dodson*, 773 F. App'x at 80, n.3. "A plaintiff may also establish the fourth element with proof that, during a reduction in force, younger employees were retained when plaintiff was fired . . . or with other facts sufficient 'to create an inference that an employment decision was based on' age." *Dodson*, 773 F. App'x at 80, n.3 (citing *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 234-36 (3d Cir. 1999) and quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996)).

[93] *Id.* (quoting *Jones v. Sch. Dist. of Phila*., 198 F.3d 403, 412 (3d Cir. 1999)).

[94] *Burton,* 707 F.3d at 426 (quoting *Tomasso v. Boeing Co*., 445 F.3d 702, 706 (3d Cir. 2006)).

[95] *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764–65 (3d Cir. 1994)).

[96] *Fuentes*, 32 F.3d at 764.

[97] The "same actor" inference allows an employer to argue it did not act with discriminatory intent where the same person hired and terminated an employee. In *Waldron v. SL Indus., Inc*., 56 F.3d 491 (3d Cir. 1995), our Court of Appeals addressed whether it should apply the "same actor" inference first articulated in a decision by the United States Court of Appeals for the Fourth Circuit in *Proud v. Stone*, 945 F.3d 796 (4th Cir. 1991). Our Court of Appeals declined to adopt such an inference, holding instead to consider the "same actor" who both hired and fired an employee as "simply evidence like any other and should not be accorded any presumptive value." *Waldron*, 56 F.3d at 496, n.6. Guardant asserts Mr. Collora both hired and fired

Mr. Carroll. ECF Doc. No. 19-4 ¶¶ 10, 64. Mr. Carroll disagrees, asserting both Mr. Collora and Ms. Usilton hired him. ECF Doc. No. 23 § B, ¶ 10. He does not dispute Mr. Collora fired him. The record shows Mr. Collora spoke with Ms. Usilton about hiring Mr. Carroll, she thought Guardant should hire Mr. Carroll, Mr. Collora "supported that hire," and "ultimately, . . . those decisions are [his] as the head of the department." ECF Doc. No. 19-2 at 88a-89a, pp. 65-66. There is no dispute Ms. Usilton reported to Mr. Collora, and there is no dispute Mr. Collora is the decisionmaker on hiring "as head of the department." There is no genuine issue of fact as to Mr. Collora's hiring and firing of Mr. Carroll. Consistent with our Court of Appeals, the "same actor" evidence, "like other evidence in the record, is important but not dispositive." *Wurtz v. Day and Zimmerman, Inc*., No. 08-3503, 2009 WL 2178013, at *4 (E.D. Pa. Dec. 28, 2009).

[98] ECF Doc. No. 19-2 at 118a, p. 183.

[99] *Jeffrey v. Thomas Jefferson Univ. Hosp. Inc*., No. 17-0531, 2019 WL 2122989, at *5 (E.D. Pa. May 14, 2019) (citing *Edgerton v. Wilkes-Barre Home Care Services, LLC,* 600 F. App'x 856, 858 (3d Cir. 2015)).

[100] Guardant's cite to *Joseph v. First Judicial District*, No. 97–6703, 1999 WL 79056 (E.D. Pa. Feb. 2, 1999) is inapposite. Guardant cites *Joseph* in arguing its replacing Mr. Carroll with the younger Mr. Liebetreu is insufficient to create an inference of age discrimination. But that is not the holding of *Joseph*. The employer there conceded it replaced plaintiff with a younger employee but argued, unlike here, the employee did not suffer an adverse employment action to satisfy the *prima facie* case. *Id.* at * 3. The court did not resolve the issue, assumed plaintiff satisfied a *prima facie* case of age discrimination, and turned to the pretext issue. The court ultimately found plaintiff failed to meet his burden to show pretext including "the fact that a younger person was hired to replace [plaintiff], ***while helpful in establishing a prima facie case of age discrimination***, is not dispositive of whether an employer discriminated based upon age." *Id.* at *5 (emphasis added). *Joseph* does not support Guardant's argument at the *prima facie* stage.

[101] *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993).

[102] *Fuentes*, 32 F.3d at 763.

[103] ECF Doc. No. 19-1 at 9.

[104] *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)) (emphasis in original).

[105] *Ortiz v. Cedar Crest College*, 764 F. App'x 257, 259 (3d Cir. 2019) (quoting *Burton*, 707 F.3d at 427).

[106] *Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 92 (3d Cir. 2020) (citing *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998)).

[107] *Maull v. Div. of State Police*, 39 F. App'x 769, 774 (3d Cir. 2002) (citing *English v. Colorado Dep't of Corr.*, 248 F.3d 1002, 1009 (10th Cir. 2001)).

[108] *Id.* (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995)).

[109] *Durst v. City of Phila.*, 798 F. App'x  710, 713 (3d Cir. 2020) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003)).

[110] *Opsatnik v. Norfolk So. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (quoting *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000)); *see also Durst*, 798 F. App'x at 713 ("[r]elevant factors include whether the comparators had the same supervisor, were subject to the same standards, and had engaged in similar conduct.") (citing *Johnson*, 319 F. 3d at 867)

[111] *Opsatnik,* 335 F. App'x at 223 (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006)).

[112] *Abdul-Latif v. Cnty. of Lancaster*, 990 F.Supp.2d 517 (E.D. Pa. 2014) (citations omitted).

[113] ECF Doc. No. 21-2 at 662a-664a; ECF Doc. No. 30 at 850a, ¶ 5.

[114] ECF Doc. No. 21-2 at 662a-664a.

[115] *Id.* at 652a-657a.

[116] ECF Doc. No. 30-1 at 849a-850a, ¶ 4.

[117] ECF Doc. No. 21-2 at 652a-657a.

[118] *Id.* at 658a–661a.

[119] ECF Doc. No. 30-1 at 850a, ¶ 6.

[120] ECF Doc. No. 19-1 at 538a.

[121] ECF Doc. No. 21-2 at 652a–657a.

[122] *Id.* at 658a–661a.

[123] *Id.* at 662a–664a.

[124] ECF Doc. No. 1 ¶ 82.

[125] *Power v. Lockheed Martin Corp.*, 419 F. Supp. 3d 878, 902 (E.D. Pa. 2020) (quoting *Howell v. Millersville Univ. of Pa.*, 283 F. Supp. 3d 309, 332 (E.D. Pa. 2017)).

[126] *Wright*, 822 F. App'x at 96 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) and *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

[127] *Harris*, 510 U.S. at 21; *see also Mazur v. Sw. Veterans Ctr.*, 803 F. App'x 657, 662 (3d Cir. 2020) (plaintiff's Title VII hostile work environment fails where stray comments about plaintiff being "no good" or being "nobody" were neither discriminatory nor severe or pervasive enough to alter the conditions of employment).

[128] ECF Doc. No. 1 ¶ 82.

[129] *Smith v. N3 Oceanic, Inc.*, 717 F. App'x 162, 165 (3d Cir. 2017) (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)).

[130] ECF Doc. No. 1 ¶ 83.

[131] ECF Doc. No. 19-1 at 7–8.

[132] *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 69 (3d Cir. 2017).

[133] 42 U.S.C. § 2000e-2(a)(1).

[134] ECF Doc. No. 1 ¶¶ 90-92.

[135] ECF Doc. No. 19-1.

[136] ECF Doc. No. 21.

[137] 490 U.S. 228 (1989).

[138] *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787–88 (3d Cir. 2016) (quoting *Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir. 2008)).

[139] ECF Doc. No. 19-2 at 118a, pp. 183–184.

[140] *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010) (quoting *Walden v. Georgia–Pacific Corp.*, 126 F.3d 506, 512 (3d Cir. 1997)).

[141] *Id.*

[142] *Id.* (internal quotations omitted).

[143] *Id.* (internal citations omitted).

[144] *Id.* (citing *Walden*, 126 F.3d at 512–13).

[145] *Robinson v. Nat'l R.R. Passenger Corp.*, 821 F. App'x 97, 101 (3d Cir. 2020) (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999)).

[146] *Morgan v. Fiorentino*, 811 F. App'x 798, 803 (3d Cir. 2020) (*Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)).

[147] *Id.*

[148] ECF Doc. No. 30 at 7.

[149] Although he does not directly address the issue, Mr. Carroll may be attempting to argue pretext under a "cat's paw" theory. Under this theory, an employee may hold his employer liable "for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 413 (2011); *Kowalski v. Postmaster Gen. of U.S.*, 811 F. App'x 733, 739 (3d Cir. 2020). Courts may hold an employer liable under the "cat's paw" theory, where the decision-maker is free from discriminatory animus but evidence proves another employee, allegedly motivated by discriminatory animus, influenced the decision to terminate the employee. *Ramirez v. Palmer Twp.*, 292 F. Supp. 3d 609, 626 (E.D. Pa. 2018) (citing *Burlington v. News Corp.*, 55 F. Supp. 3d 723, 731 (E.D. Pa. 2014)).

A plaintiff "can establish a genuine issue of material fact on a cat's paw theory of liability if he establishes that one or more of his nonsupervisory co-workers: (1) performed an act motivated by discriminatory animus; (2) the act was intended by the co-worker to cause an adverse employment action; (3) that act is a proximate cause of the ultimate employment action, . . . , and either (a) defendants acted negligently by allowing the co-worker's acts to achieve their desired effect though they knew (or reasonably should have known) of the discriminatory motivation, . . . or (b) the co-worker was aided in accomplishing the adverse employment action by the existence of the agency relation." *Burlington*, 55 F. Supp. 3d at 738–39 (internal citations and citations omitted). There is no evidence Ms. Barlow or Ms. Kiedrowski "performed an act motivated by discriminatory animus", "the act was intended . . . to cause" Mr. Carroll's termination, proximate cause, and Guardant's negligence "by allowing" Ms. Barlow or Ms. Kiedrowski's "acts to achieve their desired effect though [Guardant] knew (or reasonably should have known) of the discriminatory motivation . . . ." Mr. Carroll points to text messages and the alleged fabricated comments, but ignores Mr. Bianco, a man, reported the "f***ing chick" comment and Mr. Collora, a man, investigated the comments and, at the end of the day, concluded Mr. Collora made the comments complained of.  We see no basis for a cat's paw theory to create a fact issue on pretext.

[150] *Fuentes*, 32 F.3d at 764.

[151] *Id.* at 765. Mr. Carroll must show Guardant "believed its own investigation into [his] actions was incorrect and that its real motives were discriminatory. It is not enough for [Mr. Carroll] to argue [he] did not violate company policy, or that [Guardant's] investigation into [his] conduct was flawed. It has been stated that 'the Court do[es] not sit as a super-personnel department that

reexamines an entity's business decisions. No matter how medieval a firm's practice, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere." *Bloch v. Mack Trucks, Inc.,* 240 F. Supp. 3d 365, 374 (E.D. Pa. 2017) (quoting *Murphy v. Ctr. for Emergency Med. of W. Pa.*, 944 F. Supp. 2d 406, 435 (W.D. Pa. 2013)).

[152] *Frymoyer v. East Penn Mfg. Co., Inc.*, 757 F. App'x 97, 101 (3d Cir. 2018) (citing *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 152 (3d Cir. 2017)). *See also McFalls v. BrightView Landscapes, LLC*, No. 18-2871, 2020 WL 1922828, at * 7 (E.D. Pa. Apr. 21, 2020) (rejecting argument of inadequate investigation as basis of adverse action) (collecting cases).

[153] *Id.* (quoting *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 262 (3d Cir. 2017) (citation and quotation marks omitted)).

[154] *Id.*

[155] ECF Doc. No. 19-2 at 108a, pp. 142-144.

[156] *Id.* at 275a, pp.78-80.

[157] *Id.* at 154a, p. 85.

[158] *Id.* at 205a, p. 97.

[159] ECF Doc. No. 23 § G, ¶ 54.

[160] *Id.* at § G, ¶ 53.

[161] ECF Doc. No. 19-2 at 102a, p. 121.

[162] *Id.* at 102a-103a, pp. 121-123.

[163] *Id.* at 108a.

[164] *Id.*

[165] ECF Doc. No. 19-2 at 109a, p. 146.

[166] *Chinery v. Am. Airlines*, 778 F. App'x 142, 145 (3d Cir. 2019) (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).

[167] *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998); *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001); *Caver v. City of Trenton*, 420 F.3d 243, 262-63 (3rd Cir. 2005); *Castleberry v. STI Grp*., 863 F.3d 259, 264 (3d Cir. 2017)).

[168] ECF Doc. No. 19-2 at 34a-35a, pp. 132-133.

[169] *Mazur v. Sw. Veterans Ctr.*, 803 F. App'x 657, 661-62 (3d Cir. 2020) (citing *Harris*, 510 U.S. at 21).

[170] *Abuomar v. Dep't of Corr.*, 754 F. App'x 102, 107 (3d Cir. 2018) (quoting *Faragher*, 524 U.S. at 787-88).

[171] *Stucke v. City of Phila.*, 685 F. App'x 150, 154 (3d Cir. 2017) (quoting *Faragher*, 524 U.S. at 788).

[172] ECF Doc. No. 1 ¶ 91.

[173] *Petti v. Ocean Cty. Bd. of Health*, No. 19-2137, 2020 WL 7238410, at *4 (3d Cir. Dec. 9, 2020) (quoting *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006)).

[174] ECF Doc. No. 1 ¶ 92.

[175] *Id.*

[176] *Boyle v. City of Phila.*, No. 17-262, 2020 WL 4459131, at *4 (E.D. Pa. Aug. 4, 2020) (quoting *Stagi v. Nat'l R.R. Passenger Corp.*, 391 F. App'x 133, 140 (3d Cir. 2010)).

[177] *George W. Kistler, Inc. v. O'Brien*, 347 A.2d 311, 315 (Pa. 1975) (citations omitted).

[178] *Id. See also Overseas Strategic Consulting, Ltd. v. Larkins,* No. 01–4115, 2001 WL 1198661, at *4 (E.D. Pa. Oct. 10, 2001) (parties may bind themselves orally even when contemplating a later written contract but must manifest mutual intent to do so, and there must be agreement on all aspects of the employment relationship).

[179] ECF Doc. No. 23 § C, ¶ 15.

[180] *Woods v. Era Med LLC*, 677 F. Supp. 2d 806, 816 (E.D. Pa. 2010) (quoting *Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572, 580 (Pa. Super. Ct. 2003)).

[181] ECF Doc. No. 19-2 at 54a, pp. 209–210.

[182] *Id.* at 54a, p. 211.

[183] ECF Doc. No. 23 § C, ¶ 15.

[184] *Id.*

[185] *George W. Kistler, Inc.*, 347 A.2d at 315–16.

[186] In his response to Guardant's motion for summary judgment, Mr. Carroll makes a passing reference to a California choice of law provision in the offer letter. ECF Doc. No. 21 at 19. Mr. Carroll does not rely on California law and, when asked at oral argument, his counsel admitted California law did not apply.

[187] *Deal v. Children's Hosp. of Phila.*, 223 A.3d 705, 711 (Pa. Super. Ct.  2019) (citing *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 286-87 (Pa. 2000); *Krolczyk v. Goddard Systems, Inc.*, 164 A.3d 521, 527 (Pa. Super. Ct. 2017); *Wakeley v. M.J. Brunner, Inc.*, 147 A.3d 1, 5 (Pa. Super. Ct. 2016)).

[188] *Deal*, 233 A.3d at 711 (citing *Krolczyk, Inc.*, 164 A.3d at 527; *Wakeley*, 147 A.3d at 5).

[189] *Id.* (citing *Wakeley*, 147 A.3d at 5–6).

[190] ECF Doc. No. 19-2 at 57a, p. 222. At Mr. Carroll's deposition, his counsel objected to the form of the question, "Did you believe you were an at-will employee of Guardant?" as calling for a legal conclusion. In response to Guardant's Statement of Undisputed Material Facts, Mr. Carroll denied his at-will employment status despite his deposition testimony because it is "a legal conclusion, and not a statement of fact, and was objected to as such by Mr. Carroll's counsel and are not admissible in support of a motion for summary judgment as they do not represent undisputed facts." ECF Doc. No. 23 § C, ¶ 16.

[191] *Janis v. AMP, Inc.*, 856 A.2d 140, 144 (Pa. Super. Ct. 2004) (quoting *Rapagnani v. The Judas Co.*, 736 A.2d 666, 669 (Pa. Super. Ct. 1999)).

[192] *Woods*, 677 F. Supp. 2d at 817 (citing *Scully v. U.S. WATS, Inc.*, 238 F.3d 497, 505 (3d Cir. 2001)).

[193] *Id.* (citing *Stumpp v. Stroudsburg Mun. Auth.*, 658 A.2d 333, 335 (Pa. 1995)).

[194] *Id.* (citing *Ruzicki v. Catholic Cemeteries Ass'n of Diocese of Pittsburg*, 610 A.2d 495, 497 (Pa. Super. Ct. 1992)).

[195] *Id.* (citing *Rapagnani*, 736 A.2d at 670–71; *Darlington v. Gen. Elec.*, 504 A.2d 306, 315 (Pa. Super. Ct. 1986), *overruled on other grounds*, *Krajsa v. Keypunch, Inc.*, 622 A.2d 355, 360 (Pa. Super. Ct. 1993)).

[196] *Id.* (quoting *DiBonaventura v. Consol. Rail Corp.*, 539 A.2d 865, 867 (Pa. Super. Ct. 1988)).

[197] *Id.* (quoting *DiBonaventura*, 539 A.2d at 868).

[198] 595 A.2d 70 (Pa. Super. Ct. 1991). Mr. Carroll's brief suggested the offer letter contains a California choice of law clause. He abandoned this choice of law theory at oral argument.

[199] 597 A.2d 662, 665 (Pa. Super. Ct. 1991).

[200] *Woods*, 677 F. Supp. 2d at 819.

[201] *Id.* at 820–22.

[202] 38 F. Supp. 2d 372, 379–80 (E.D. Pa. 1999).

[203] *Id. See also Preobrazhenskaya v. Mercy Hall Infirmary*, 71 F. App'x 936, 940 (3d Cir. 2003) (citing  *Darlington*, 504 A.2d at 315) ("Leaving one job to take another one has been held to be 'simply a reasoned choice of a new career goal' rather than additional consideration implying an employment contract.").

[204] *Haywood v. Univ. of Pittsburgh*, 976 F. Supp. 2d 606, 627 (W.D.Pa. 2013) (citing *Zaloga v. Provident Life & Accident Ins. Co. of Am.*, 671 F. Supp. 2d 623, 630-31 (M.D.Pa. 2009)).

[205] *Haywood*, 976 F. Supp. 2d at 627.

[206] *Comcast Spectacor L.P. v. Chubb & Son, Inc.*, 05-1507, 2006 WL 2302686, at *19 (E.D. Pa. Aug. 8, 2006) (quoting *Blue Mountain Mushroom Co., Inc. v. Monterey Mushroom, Inc.*, 246 F. Supp. 2d 394, 400-01 (E.D. Pa. 2002)).

[207] *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 292, n. 12 (3d Cir. 2020) (quoting *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999)).

[208] ECF Doc. No. 19-2 at 47a, p. 184.

[209] *Id.* at 70a, pp. 274-75.

[210] *Id.* at 70a, p. 275.

[211] ECF Doc. No. 1 ¶¶ 110-115.

[212] *Burns v. Cooper*, No. 2571 EDA 2019, 2020 WL 4592061, at *6 (Pa. Super. Ct. Aug. 11, 2020) (quoting *Walnut St. Assoc., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 98 (Pa. Super. Ct. 2009), *aff'd*, 20 A.3d 468 (Pa. 2011)).

[213] *Id.* (quoting *Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 932-33 (Pa. Super. Ct. 2013)).

[214] *Hennessy v. Santiago*, 708 A.2d 1269, 1279 (Pa. Super. Ct. 1998); *see also Haun v. Community Health Systems, Inc.,* 14 A.3d 120, 125 (Pa. Super. Ct. 2011).

[215] *Ruder v. Pequea Valley Sch. Dist.*, 790 F. Supp. 2d 377, 395 (E.D. Pa. 2011).

[216] *Whaumbush v. City of Phila.*, 747 F. Supp. 2d 505, 513 (E.D. Pa. 2010) (citing *Labalokie v. Capital Area Intermediate Unit*, 926 F. Supp. 503, 509 (M.D. Pa. 1996)).

[217] *Id.*

[218] *Joseph v. Scranton Times L.P.*, 129 A.3d 404, 424 (Pa. 2015) (quoting 42 Pa. Cons. Stat. Ann. § 8343(a)).

[219] *Id.* (quoting 42 Pa. Cons. Stat. Ann. § 8343(b)).

[220] ECF Doc. No. 23 § L, ¶¶ 88, 90.

[221] *Id.* ¶ 91.

[222] ECF Doc. No. 19-2 at 518a, pp. 12-13.

[223] *Id.* at 505a-507a, pp. 9-17.

[224] *Id.* at 495a-496a, pp. 21-28.

[225] *Stewart v. SWEPI, LP*, 918 F. Supp. 2d 333, 342 (M.D.Pa. 2013) (citing *Sobel v. Wingard*, 366 Pa. Super. 482, 531 A.2d 520, 522 (Pa. Super. Ct. 1987)).

[226] *Miketic v. Baron*, 675 A.2d 324, 329 (Pa. Super. Ct. 1996) (citing *Beckman v. Dunn*, 419 A.2d 583, 588 (Pa. Super. Ct. 1980)).

[227] *Foster v. UPMC South Side Hosp.*, 2 A.3d 655, 664 (Pa. Super. Ct. 2010) (collecting cases).

[228] *Moore v. Cobb-Nettleton*, 889 A.2d 1262, 1269 (Pa. Super. Ct. 2005) (citing *Miketic*, 675 A.2d at 329).

[229] ECF Doc. No. 19-2 at 148a, p.59.

[230] *Id.* at 148a, pp. 60-61.

[231] ECF Doc. No. 21-2 at 669a.

[232] ECF Doc. No. 19-2 at 477a-478a, pp. 93-94.